(No. 13413.—Judgment affirmed.)

FRANK W. RAVLIN *vs.* THE CHICAGO, AURORA AND DE-
KALB RAILROAD COMPANY.—(F. W. CHERRY, Plaintiff
in Error, *vs.* HARVEY GUNSUL, Receiver, *et al.* Defend-
ants in Error.)

*Opinion filed February 15, 1921—Rehearing denied April 14, 1921.*

1. FRAUD—*the fraud must be specifically pleaded and clearly
proved.* A complainant who assails certain transactions as fraudu-
lent must plead specific acts or facts relied on to establish the
fraud, and the acts so charged must be clearly and distinctly proved
in order to authorize relief.

2. SAME—*objection that allegations of fraud are insufficient can
not be made for first time in Supreme Court.* Even where it is
necessary to plead and establish fraud in order to recover in a par-
ticular case in equity, if the insufficiency of the allegations is not
urged in the trial court, either by demurrer or in opposition to the
introduction of testimony, the objection cannot be made for the
first time in the Supreme Court.

3. RECEIVERS—*receiver can make no profit for himself in deal-
ings with the trust property.* One who accepts an appointment as
a receiver cannot permit his personal interest to conflict with his
duties as receiver and can make no profit for himself out of his
trust other than the compensation which the court may allow him
under the law, and any benefit from his dealings with the trust
property must inure to the trust estate, notwithstanding there is
no fraud and no loss to the company for which he is receiver.

4. SAME—*receiver who has mixed his private affairs with the
trust must prove clearly what his interests are.* A receiver who
has mixed his private affairs with the affairs of the company of
which he is receiver has the burden of proving clearly what profits
rightly belong to himself, when his conduct as receiver is called
in question.

5. SAME—*receiver cannot act as agent for party who is dealing
with company of which he is receiver.* A receiver has no right to
act as agent and representative for another in a matter in which
the company of which he is receiver is interested.

WRIT OF ERROR to the Appellate Court for the Second
District;—heard in that court on appeal from the Circuit
Court of Kane county; the Hon. C. F. IRWIN, Judge, pre-
siding.

JOHN A. RUSSELL, for plaintiff in error.

JOHN K. NEWHALL, for defendant in error Harvey Gunsul, receiver.

PEFFERS & WING, for defendants in error Enos Doan and George E. May.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

The Chicago, Aurora and DeKalb Railroad Company was organized in 1909 under the general Railroad act of Illinois and since that time has operated an electric railroad between Aurora and DeKalb, cities in Illinois. In 1913 J. H. Bliss and W. S. Kirby were appointed receivers of the company and served until July 10, 1916, when plaintiff in error became receiver. At the September term, 1917, of the circuit court of Kane county plaintiff in error resigned. His final report was approved and his resignation accepted. Before the end of that term, on motion of defendants in error Enos Doan and George E. May, stockholders and creditors of the company, the order approving said report was vacated. Thereafter Doan and May by leave of court filed an intervening petition attacking various acts of plaintiff in error as receiver, and especially charging that while receiver he had made large profits from secret sales of the stock and bonds of the company. About that time the holder of certain bonds of the company filed a bill to foreclose the trust deed securing said bonds, and in that cause defendant in error Harvey Gunsul was appointed receiver of the company. Thereafter Gunsul, as receiver, by leave of court filed in this cause an intervening petition attacking the conduct of plaintiff in error as receiver, which petition was similar to that of Doan and May. Plaintiff in error answered these petitions and they were consolidated for hearing. The cause was heard by the chancellor, who entered a decree directing plaintiff in error to pay Gunsul,

as receiver, $47,066.71 which he found plaintiff in error, while receiver, had made as profit on the sale of certain securities of the company, $2350 which he found plaintiff in error had paid his attorney without authority of court, and $3000 which he found plaintiff in error had paid a Princeton bank without authority of court. The cause was reviewed by the Appellate Court for the Second District on writ of error. Errors and cross-errors were assigned. The Appellate Court reversed the decree of the circuit court as to the $2350 paid by plaintiff in error as receiver to C. A. Trimble as attorney fees, as to the matter of interest upon the $3000 paid the Princeton bank and as to the failure to charge plaintiff in error interest on said profits, and in all other respects affirmed the decree. By the judgment of the Appellate Court the cause was remanded to the circuit court of Kane county, with directions to modify the decree in conformity with its opinion. The cause is brought to this court by *certiorari.*

Plaintiff in error admits that the $3000 paid the Princeton bank was properly charged to him and that the judgment of the Appellate Court with regard to interest on the item was correct. He contends that the intervening petitions do not state a cause of action; that the contracts and documents in evidence show, as a matter of law, that he is not liable to defendants in error; that a certain worthless $10,000 note was improperly charged to him in fixing the amount of the decree, and that the amount of profits is not properly computed. Defendants in error have assigned cross-errors asking that the plaintiff in error be deprived of the fees paid him as receiver, that interest be allowed on the profits from February 13, 1917, and that the item of attorney fees be charged to plaintiff in error.

Plaintiff in error insists with much force that the intervening petitions filed in this cause are insufficient and do not state a cause of action. He contends that the petitions are a series of general averments and conclusions of

the pleaders, and that this court has held such averments insufficient where fraud is the basis of the claim.   It is true that when one assails as fraudulent certain transactions the complaining party must plead specific acts or facts relied on to establish the fraud, and the acts thus charged must be clearly and distinctly proved or there can be no relief. (*Dexter* v. *McAfee,* 163 Ill. 508; *Langlois* v. *McCullom,* 181 id. 195.)   Even if it were necessary to plead and establish fraud in order to recover in this case, it was not urged in the court below that the intervening petitions were insufficient, either by demurrer to the petitions or in opposition to the introduction of testimony, and consequently the objection cannot be made here for the first time.   (*Smith* v. *Henline,* 174 Ill. 184.)   If the allegations were not sufficiently specific in this regard and attention had been called to them in the court below the petitioners there might have been permitted to amend their petitions.

To properly consider the other points it will be necessary to review the evidence.   It shows that Henry H. Evans, of Aurora, had obtained charters for two interurban railroads, and he desired to buy a controlling interest in the stocks and bonds of the Chicago, Aurora and DeKalb Railroad Company and merge the properties into one general system.   The DeKalb company had a capital stock of $950,000.   It had issued $200,000 of first mortgage bonds secured by a trust deed, and $750,000 of what it called general mortgage bonds secured by a second trust deed. Plaintiff in error had had experience in promoting railroad properties, and so Evans arranged with him to secure a sufficient amount of the capital stock and the outstanding mortgage bonds of this company to give Evans control. Evans did not want to be known in the transaction, so plaintiff in error was to deal in his own name.   He made investigations and found that theretofore the company had given various promissory notes to various banks, and that each of said notes had been endorsed by J. H. Bliss, Wil-

liam George, B. G. Richmond, A. J. Erlenborn, John Loser, Peter Klein and Frank W. Ravlin, directors of the company, and as further security said directors had deposited with said banks, as collateral security, $50,000 of the first mortgage bonds and $122,500 of the second or general mortgage bonds, and that afterwards, when the banks demanded payment, said notes had been paid by the endorsers, and, with the collateral securities, placed in the hands of W. C. Estee under a trust agreement hereinafter described. Each of said directors also owned a large amount of the capital stock of the company, aggregating $387,600 at par value, and general mortgage bonds aggregating $80,000. Thereupon plaintiff in error sought to buy said bonds and stock. He could not at that time deal with George or Erlenborn. June 6, 1916, he made a written contract with the other five of the seven directors to buy all their interests, and later a supplement was added to this contract. June 12, 1916, he made a written contract with Evans by which he agreed to obtain said stock and securities and sell and assign the same to Evans, and also obtain the interests of George and Erlenborn and deliver those to Evans as soon as he received them, and Evans was to pay certain sums therefor.

This litigation grows out of the performance of these agreements. The principal item involved is the profit made by plaintiff in error from the sale of the securities held by Estee as trustee for Bliss and his associates, five-sevenths of which was purchased by plaintiff in error under his contract of June 6, 1916. Practically the only issue raised throughout this litigation has been the time of the completion of the above contracts, the first being designated for convenience the Bliss-Cherry contract and the second the Evans-Cherry contract. Defendants in error claim certain foreclosure proceedings brought to the February term, 1917, by Bliss and his associates, beneficiaries in the Estee trust agreement, against the railroad company and against

plaintiff in error as receiver, were instituted at the expense of plaintiff in error and by his procurement; that the object of this suit was to enable plaintiff in error to fulfill the provisions of the Evans-Cherry contract; that he concealed from the court that he had such a contract with Evans; that he permitted the court to approve the sale of these securities at a price much less than the price Evans had contracted to pay for the bonds; that thereby, while receiver and because of his concealment of the true facts from the court, plaintiff in error had made a large profit for himself, and that he must in equity surrender that profit to the railroad company. On the other hand, plaintiff in error contends that he had completed his contract with Evans and that he had obtained all his profits on said contract on and before June 28, 1916; that his dealings in these securities were closed before he became receiver and that he did nothing afterwards inconsistent with his duty as receiver; that what he did afterwards in the matter of dealing in the securities of the company was at the request of Evans and for the accommodation of Evans; that these transactions were without profit to himself and that he had no interest therein.

The provisions of the contracts in question throw much light on the subject at hand. According to a recital in the Estee agreement, the notes which Bliss and his six associate directors had to pay amounted to $63,564.80. To protect themselves they took over the collateral security theretofore deposited,—$50,000 first mortgage bonds and $122,500 general mortgage bonds of said railroad company,—and placed these securities in the hands of Estee as trustee, each of them being entitled to participate equally in the collateral security. The trustee agreed to deliver these securities to the owners or to their order upon their unanimous request. The agreement further provided that no attempt should be made to enforce the collection by sale of the collateral unless enough could be secured to discharge

the full indebtedness, with interest, or unless the trustee
was requested in writing by all the owners, and further
provided that after the expiration of one year the trustee
might, on the request of three of said owners, enforce the
collection of said indebtedness by a sale of the bonds held
as collateral, and gave him full authority to proceed to en-
force such collection in any manner, except that he was not
permitted to collect the indebtedness from any of the seven
directors. The Bliss-Cherry contract provided that plain-
tiff in error was to pay Bliss, Richmond, Klein, Ravlin
and Loser $92,289.79 for all their interest in the railroad
properties, which consisted of $80,000 of general mortgage
bonds, $387,600 of stock and five-sevenths of the securities
covered by the Estee agreement. It provided that the Estee
agreement and the securities therein described should be
properly assigned to plaintiff in error; that the five di-
rectors should give to plaintiff in error their irrevocable
power of attorney authorizing him in their name, but with-
out expense to them, to take and prosecute such actions
and proceedings as would foreclose the pledge of the col-
lateral securities mentioned in the Estee agreement and
enforce the security thereof for the payment of the in-
debtedness. It further provided that in the event of such
foreclosure any and all interests in property of any kind ac-
quired under the foreclosure or under the contracts should
be included in the assignment, and that immediately upon
acquiring any such properties or interests, under such fore-
closure or otherwise, the same should be transferred and
conveyed to plaintiff in error by Bliss and his associates.
It further provided that the bonds and the stock held by
Bliss and his associates should be properly assigned to plain-
tiff in error, so that all their interests would pass to plain-
tiff in error. It also provided that all parties interested in
the stock who were officers and directors should deposit
with the stock their resignation as such officers and direct-
ors. Bliss and his associates assigned the railroad company

notes and their five-sevenths part of the securities covered
by the Estee agreement, with the provision, however, that
none of the notes enumerated therein should be collected
from any of the five assignors.  The Evans-Cherry con-
tract, entered into six days later, provided that Evans was
to pay plaintiff in error $105,000 for $175,000 of general
mortgage bonds of the railroad company, or sixty per cent
of their face value.  By the agreement plaintiff in error
undertook to secure for Evans the bonds, stock and securi-
ties covered by the Bliss-Cherry agreement, and also agreed
to endeavor to acquire the remaining two-sevenths inter-
est in the Estee agreement and the securities therein men-
tioned, which were owned by George and Erlenborn.  Three
days following the execution of the Evans-Cherry agree-
ment plaintiff in error secured an amendment to the Bliss-
Cherry agreement.  This amendment provided that plain-
tiff in error should be given power immediately to cause
the foreclosure of the securities mentioned in the Estee
agreement, and provided further that if for any reason be-
yond his control the sale of such securities was delayed,
by reason of injunction or otherwise, he should be given
an extension of time on certain payments under his con-
tract, not exceeding, however, six months from the date of
the supplemental agreement.  The supplemental agreement
further provided that Bliss and his associates should de-
posit with the capital stock, when assigned, an irrevocable
power of attorney authorizing plaintiff in error to vote all
of the capital stock at any meeting of the stockholders of
the railroad company, at all elections and on any subject
which might arise at the meeting, in the same manner and
with the same effect as if he were the absolute owner of
all of the stock.

These agreements are in plain and unambiguous lan-
guage and call for no construction.  They are executory
contracts, and it cannot be held, as contended by plaintiff
in error, that a legal construction of these contracts is de-

terminative of the question of his liability to account for profits. The contracts fix the rights of the parties in their future transactions with the property covered by their terms, but the profits could not be determined until the contracts were fully executed. Plaintiff in error could, and did, immediately transfer and assign to Evans all the bonds and stock which he secured that were not tied up by the terms of the Estee agreement. The railroad company still owned the bonds covered by the Estee agreement, and it was entitled to their return when it paid the notes which these bonds were deposited to secure. If the railroad company failed to pay the notes and the holders of the notes enforced payment by a sale of the securities, the railroad company was entitled to whatever balance was left from the sale of the securities after the notes were satisfied. The plaintiff in error, therefore, could not fulfill his agreement with Evans until he secured the bonds deposited as collateral security. Under the Bliss-Cherry contract he owned an undivided five-sevenths interest in the notes of the railroad company and in the collateral security held by Estee as trustee. He had no rights in or control of the other undivided two-sevenths interest owned by George and Erlenborn. In order to secure the title to the securities covered by the Estee agreement plaintiff in error proceeded to get control of the affairs of the railroad company. Under the terms of the supplemental agreement with Bliss and his associates he was enabled to carry out this plan.

Plaintiff in error contends that he had a full settlement with Evans on June 27 and 28, 1916, and that thereafter he had no interest in any of the contracts hereinbefore described, and he denies that he entertained any idea of getting control of the railroad company for the purpose of fulfilling his agreement with Evans. From an examination of the entire record we are convinced that his statement in this regard is not true. July 10, 1916, he was appointed receiver of the railroad company, and at a meet-

ing of stockholders of the company held shortly thereafter the old directors and officers resigned and plaintiff in error had himself, his attorney, and others selected by him, elected in their stead. This hand-picked board of directors elected him president, and thereafter he had full control of all the company's affairs. From a series of letters and other exhibits appearing in the record it is clear that plaintiff in error had not yet completed his contract with Evans, and that he continued his dealings with him long after he accepted the position of receiver of this railroad company. August 16, 1916, more than a month after he became receiver, he wrote Evans, pointing out that under the provisions of their agreement Evans was to receive general mortgage bonds to the amount of $175,000, thereby clearly indicating that Evans had not yet received all the bonds which plaintiff in error had contracted to deliver. In the letter plaintiff in error states an account showing a balance of $52,000 due him, and concludes by saying that the balance "is based on our ability to acquire all the bonds called for in our agreement." On October 4, 1916, nearly three months after he had been appointed receiver, he wrote F. B. Watson, cashier of the First National Bank of Aurora, depositing certain bonds to take the place, temporarily, of some of the securities covered by the Estee agreement, and explaining that J. C. Murphy, a former attorney for the railroad company who was suing the company for $100,000 for legal services, had instituted proceedings to prevent the distribution of the securities covered by the Estee agreement. December 29, 1916, Cairo A. Trimble, of Princeton, who was not only attorney for plaintiff in error as receiver but was also his personal attorney, wrote plaintiff in error advising a settlement with Murphy, obviously for the purpose of removing that obstacle to obtaining a foreclosure of the securities under the Estee agreement. January 29, following, a settlement was made with Murphy for $5000, the railroad company pay-

ing him $2500 and Bliss and his associates in the Bliss-Cherry agreement paying the additional $2500.

February 2, 1917, John Faissler, an attorney of De-Kalb county, secured possession of the five separate Estee agreements held by Bliss, Richmond, Klein, Loser and Ravlin, covered by the Bliss-Cherry agreement, and also obtained the consent of George and Erlenborn to allow their names to be used in certain foreclosure proceedings. February 6, 1917, cashier Watson wrote plaintiff in error that Evans had that day left with him a note for $20,000 "for your use in connection with the purchase of the securities of the DeKalb road that were deposited with W. C. Estee." Thereafter Faissler filed a bill in the name of the seven directors to foreclose and sell the bonds described in the Estee agreement. The railroad company and plaintiff in error filed a formal answer, admitting the indebtedness and asking the court to protect the rights and interests of the company, its stockholders, bondholders and creditors. A decree was entered in accordance with the prayer of the bill and the bonds were sold to Faissler for $70,485.92,—$70,210.92 principal and interest of the notes and $275 costs. The seven directors signed a receipt showing that they had received from the master in chancery their full share in the proceeds of the sale of the collateral securities.

Several of these directors, beneficiaries under the Estee agreement, testified that they did not hire Faissler and did not pay any of the expense of the foreclosure. The record shows that plaintiff in error advanced costs of the proceeding and that he did not in good faith contest the proceeding but that he hurried it along as fast as he could. On the same day that the bill was filed Trimble filed the answer. There is some evidence that in the papers first prepared to start this proceeding Trimble appeared as complainant and that he had much to do with the preparation of the pleadings and the decree. Plaintiff in error testified that on the day of the sale he paid the master $200 and

Faissler $75. The answer of plaintiff in error to the intervening petitions admitted that the master delivered the securities sold pursuant to the foreclosure proceedings to Faissler, and that Faissler thereafter delivered to plaintiff in error the portion of said securities which plaintiff in error had purchased from Bliss and others under the Bliss-Cherry agreement. Plaintiff in error admits that immediately after this sale he purchased from Erlenborn his interest in said securities for $9650. He thereby became the owner of six-sevenths of the collateral securities covered by the Estee agreement, and thereafter delivered all he had acquired to the First National Bank or to Watson in accordance with the Evans-Cherry agreement.

All steps taken in this proceeding were in accordance with what plaintiff in error had agreed to do in the Bliss-Cherry contract. We are convinced that plaintiff in error employed Faissler to bring this suit to further the performance of his agreement with Evans. When the decree of foreclosure and sale of these securities was approved by the court plaintiff in error did not object to the approval of sale at a figure much below that for which he knew they could be sold, and he did not reveal to the court that he had a contract in his possession by which he was to be paid sixty per cent of the par value of the general mortgage bonds, nor that he knew that Evans was willing to pay seventy per cent of their par value if necessary to secure a sufficient amount of the general mortgage bonds to gain control of the company. Plaintiff in error did not get control of the company in order to perform his duties as receiver. Obviously, he had himself elected president and his friends elected directors so that he might obtain the control of the company's affairs which he had contracted to deliver to Evans in the end. The main thing not accomplished when he became receiver which his contract with Evans required of him, was the obtaining of the bonds held by Estee as trustee. All these facts lead inevitably to

the conclusion that plaintiff in error procured the bringing of this foreclosure proceeding for his own benefit and against the interests of the company for which he was receiver.

The conduct of plaintiff in error in this foreclosure proceeding would be enough to justify a decree against him for any profits made out of the sale of these securities, but the record is pregnant with other evidence equally convincing, which shows that plaintiff in error completed his contract with Evans when he was appointed receiver for the railroad company. There are in evidence three letters written by plaintiff in error to Edwin A. Bayley, of Boston, Massachusetts, dated, respectively, April 18, April 26 and May 1, 1917. No good purpose can be served by inserting them here. It is sufficient to say that what plaintiff in error says in those letters is wholly irreconcilable with his contention that he was not interested in the sale of the securities of the railroad company during the period of his receivership. He does not attempt to explain the contents of these letters, but meets the damaging statements contained in them by the unsatisfactory declaration that what he wrote to Bayley was not true. His testimony in this regard did not favorably impress the chancellor nor the Appellate Court and it does not convince us.

March 12, 1917, H. H. Evans in writing directed cashier Watson to turn over to his son, Arthur Evans, bonds of the DeKalb company amounting to $228,000, which he had in a deposit box. Below the order is written a receipt dated March 14, 1917, signed by Arthur R. Evans, which recites that he has received of Watson $185,000 of general mortgage bonds and $43,000 of first mortgage bonds, "same being delivered under a certain contract with F. W. Cherry, same to be settled for with F. W. Cherry under the terms of his agreement with H. H. Evans." This exhibit is all in the handwriting of plaintiff in error except the signatures. H. H. Evans died March 27, 1917, and his son,

Arthur R. Evans, became executor of his will. After-
wards plaintiff in error made a statement of these matters
up to April 13, 1917, to the executor. He charged H. H.
Evans with sixty per cent of the amount of the bonds he
was to acquire for Evans under the Evans-Cherry contract,
and credited Evans, besides other matters, with payments
by Evans to himself after he became receiver, as follows:
July 16, 1916, $25,000; September 22, 1916, $8000; Octo-
ber 4, 1916, $20,000; February 13, 1917, (the day of the
master's sale of the Estee collateral,) $20,000; and on a
date not stated, but apparently later, $20,000 in H. H.
Evans' secured paper. It showed an apparent balance
against Evans of $15,042. May 11, 1917, plaintiff in er-
ror furnished another statement of these transactions, show-
ing a balance of $14,706 due him from the Evans estate.
August 15, 1917, Arthur Evans, executor, and plaintiff in
error, executed a writing which professed to be a settle-
ment of the Evans-Cherry contract. It agreed that plain-
tiff in error should file his final report as receiver by Sep-
tember 10, 1917; that he should deposit in escrow his
resignation as president and the resignations of himself,
Trimble and others as directors, to take effect as soon as
plaintiff in error could get his final report approved and
himself discharged as receiver; that he should deposit in
escrow all stocks and bonds he held in the DeKalb com-
pany, "including the assignment of any interest he may
have in $387,600, par value of stock deposited by Bliss
et al. in the First National Bank of Aurora, Illinois, to-
gether with all stock owned or held in the name of each
and all of the aforesaid directors, duly endorsed in blank."
It agreed that Evans should deposit in escrow, in cash and
notes, $12,000; that when plaintiff in error had been dis-
charged as receiver the resignations and stocks and bonds
should be delivered to Evans and the cash and notes to
plaintiff in error, and this should discharge Evans and the
estate of H. H. Evans from all claims of plaintiff in error

against them arising out of the Evans-Cherry contract; and the receipt of the stock, bonds and resignations should likewise discharge plaintiff in error from his obligations. From the above statements made by plaintiff in error to the executor it appears that he received from Evans and his estate $105,000 after he became receiver of the railroad.

Having concluded from an examination of the contracts and from the evidence that plaintiff in error made a profit out of the sale of the securities of the railroad company while he was acting as its receiver, but one result can be reached. When a person accepts an appointment as receiver he must not permit his personal interests to in anywise conflict with his duty in that respect. It is well settled that a receiver can make no profit out of his trust other than the compensation which the court may allow him under the law. He cannot deal with the property involved for himself while he is receiver, and if he does, the benefit must inure to the trust estate. It makes no difference if the company for which he is receiver was not a loser in the transaction nor however free from fraud the transaction may be. *Hooper* v. *Winston,* 24 Ill. 354; *Farwell* v. *Pyle-National Electric Headlight Co.* 289 id. 157; *Magruder* v. *Drury,* 235 U. S. 106, 35 Sup. Ct. 77; 34 Cyc. 254, 255; 23 R. C. L. secs. 83, 84.

As we have said, the only point seriously contested throughout this proceeding has been whether plaintiff in error was receiver at the time these profits were made. It is now urged that even if plaintiff in error is to be charged with these profits, the chancellor erred in fixing the amount and the Appellate Court in affirming the finding of the chancellor. Inasmuch as little evidence was taken on this particular point and this theory of the case was not urged in the court below, it is with some difficulty that the exact amount of profits can be ascertained. Having mixed his private affairs with the affairs of the company of which he was receiver, the burden is on plaintiff in error to show

clearly what profits belong to himself. From our investigation of the evidence we are satisfied that the decision of the chancellor on that subject is correct and supported by the evidence. The total cost to plaintiff in error of these securities,—six-sevenths of the securities covered by the Estee agreement,—was $58,933.29, and he sold the general mortgage bonds to the Evans estate for $63,000 and used the $43,000 of first mortgage bonds at par to settle with Bliss and his associates in the Bliss-Cherry agreement. The profit was therefore $47,066.71. Furthermore, there is evidence in the record tending to show that while Evans agreed to pay, and did pay, sixty per cent of the face value of the general mortgage bonds, with the accompanying stock, which was a mere vehicle for selling bonds, in order to secure control of the railroad, he was willing to pay as high as seventy per cent of the face value if it was necessary to obtain the desired control. Because of his failure to reveal this better market to the court plaintiff in error might reasonably be charged a larger amount for profits than the amount fixed by the chancellor.

June 19, 1911, the railroad company issued to Evans a note for the principal sum of $10,000, which was unsecured and was apparently of little value in 1916. According to the statements of April 13 and May 11, 1917, submitted to the Evans estate by plaintiff in error, this note was received by plaintiff in error at its face value, to be applied in payment of bonds delivered under the Evans-Cherry agreement. While neither of these statements gives the date of the receipt of this note, it is the first item of credit on both statements and appears to have been received on or before June 16, 1916. Plaintiff in error sold Evans other bonds and stock which he secured from Bliss and his associates and from other sources. It is apparent from an examination of this record that he made large profits out of these transactions. The profits so made were made by him before he became receiver of the company, and this

297—10

proceeding questions in no way his right to retain those profits. The chancellor properly applied this $10,000 note to the individual transactions of plaintiff in error, and its value can therefore have no influence on the amount of the decree.

Trimble was employed by plaintiff in error to act as attorney for the receiver, and for such legal services as he performed plaintiff in error paid him from time to time sums aggregating $2350. It was contended in the trial court that these payments were without authority of the court, and the chancellor sustained the contention and directed plaintiff in error to pay the amount over to defendant in error Gunsul. The Appellate Court reversed this finding, and its action in that regard is questioned by the assignment of cross-errors. The appointment by plaintiff in error of an attorney and fixing his compensation was not without authority of the court. In the order appointing plaintiff in error receiver he was given authority to employ, among others, an attorney and to fix and alter the compensation, subject to the revision of the court. Trimble performed much important service for the receiver. Plaintiff in error advised with him concerning everything that was done in the operation of the railroad. It is unnecessary to enumerate the services performed by Trimble, but it is sufficient to say that the fees paid appear to be the usual and customary fees for such services. We feel that the view entertained by the Appellate Court was the correct one and that the cross-errors ought not to be sustained. If the proof had shown a charge by Trimble against the receiver for services in the foreclosure proceeding that charge would have been properly rejected, but plaintiff in error employed another attorney in that case, and it does not appear that the receiver paid Trimble anything for legal services in foreclosing upon those collaterals.

Defendants in error have questioned by the assignment of cross-error the action of the trial and Appellate Courts

in refusing to deprive plaintiff in error of his fees as receiver. The sum which he credited to himself for compensation is not shown to be unjust. He appears to have been diligent in the business of the railroad while he was receiver, and he should not be punished by depriving him of his ordinary compensation unless it appears that he was willfully unfaithful in the discharge of his duties. At the time plaintiff in error began his negotiations with Evans it does not appear that he entertained any idea of becoming receiver for the railroad company. After the plan to gain control of this railroad had been formed, and during the negotiations resulting in the Bliss-Cherry contract and the Evans-Cherry contract, plaintiff in error determined to get direct control of the railroad by having himself appointed receiver and by having himself and associates elected officers and directors of the railroad company. As we have said, plaintiff in error denies this, but we are forced to the conclusion by an examination of the agreements and the surrounding circumstances. The supplemental agreement made with Bliss and his associates, which gave plaintiff in error the immediate right to vote the stock controlled by these five men, could have been entered into for no other purpose than to accomplish the election of a board of directors controlled by plaintiff in error. The chancellor, who saw and heard all the witnesses, reached the same conclusion on this evidence, and his conclusion has been affirmed by the Appellate Court. Notwithstanding this scheme of plaintiff in error, it is apparent to us that much of the work of securing and transferring the bonds covered by the Estee agreement was done before plaintiff in error became receiver of the company, and under the circumstances we feel that depriving plaintiff in error of all the profits he made on these particular securities, much of which was earned before he became receiver, is sufficient punishment for the violation of his trust. His construction of the transaction is that his legal rights in these

securities were determined at the time the agreements were signed, and that what he did after he became receiver he did as agent and representative of Evans and not for his own personal benefit. Even if this were true, he had no right to act for another in a matter in which the company for which he was receiver was interested. As we have said, he gave diligent attention to the business of the company, and the compensation allowed him does not appear to be excessive. An examination of all the circumstances surrounding this transaction convinces us that the conclusion reached by the trial and Appellate Courts is correct.

Defendants in error further question the action of the Appellate Court in refusing to allow interest on the item of $47,066.71 from February 13, 1917, the date of the sale of the securities covered by the Estee agreement. By the decree of the circuit court, entered July 16, 1918, plaintiff in error is not required to pay more interest than that fixed by statute,—five per cent per annum from the date of the decree. The Appellate Court finds that the profits were received by plaintiff in error at different times, and that there is no sufficient basis in the evidence for charging interest from any particular date before the final settlement of the deal between plaintiff in error and Arthur Evans, executor of the estate of H. H. Evans, deceased, on August 15, 1917. The judgment of the Appellate Court requires that plaintiff in error pay interest at five per cent per annum on said profits from that date to the date of the decree. We agree with this view and the cross-error is not sustained.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*