**In re Estate of John S. Cooper, Deceased, on appeal of Byers W. Elder, Appellant, v. Robert W. Cooper, Executor of the Estate of John S. Cooper, Deceased, Appellee.**

**Gen. No. 27,226.**

1. FACTORS—*estoppel to question right to profit from subject-matter of agency.* A dealer in horses has no claim against the estate of a live stock commission agent for profits made on horses shipped by the dealer to such commission agent and by him resold at a profit for war purposes where the evidence shows that such dealer had for many years bought horses in the field and shipped them to such commission agent for resale, at the best price obtainable, the agent retaining his commission and expenses and crediting the dealer with the difference, that during the war the agent formed a partnership with a third person who could secure subcontracts for horses from "top-contractors" with the Allied Gov-

ernments, the commission agent financing such subcontracts and sharing in the profits thereof, that only persons who could obtain subcontracts from the "top-contractors" could supply horses to the Allied Governments, that such agent could not obtain subcontracts but his partner could, that as a result of such conditions, certain customs arose, in the buying of horses under which commission agents to whom horses were consigned sold the same to such subcontractors at the best prices then obtainable which were posted daily at all horse markets and that plaintiff continued to deal with the commission agent in question for several years, subject to and with knowledge of the customs and of the facts that such commission agent was selling the horses to the partnership he had formed which in turn sold them to the "top-contractors."

2. FACTORS—*extent of duty in selling goods.*  A live stock commission agent to whom a dealer of horses ships such horses for resale owes to such dealer the obligation to obtain the highest price available in the market for such horses and where the evidence shows that such commission agent did obtain the prevailing market price for horses for war purposes and that such prices were the highest prices available on the market during the time in question, the shipper cannot complain that the prices so obtained were paid by a partnership of which the commission agent was a member, which partnership in turn resold the animals at a profit to principal contractors for the European war market, where it appears that such latter market was not open to the commission agent or the dealer except by sale through subcontractors.

3. SAVING QUESTIONS FOR REVIEW—*failure to object in lower court as waiver in trial de novo on appeal.*  An estate which failed to object in the probate court to testimony by a claimant against the estate as to facts occurring prior to decedent's death is not estopped to object to claimant's testimony as to such facts on a trial *de novo* in the circuit court after an appeal by claimant.

4. HARMLESS AND PREJUDICIAL ERROR—*rejection of evidence harmless where it is considered in reaching result.*  In a proceeding against the estate of a live stock commission agent on a claim for profits alleged to be due the principal for horses sold, error of the court in refusing to permit the claimant to testify that he first learned that he had not received all the money due him after the decedent's death, on the ground that witness had already so testified, is harmless where witness has not so testified but the court in passing on claimant's case necessarily considers such testimony as having been given and claimant has the benefit thereof.

5. WITNESSES—*death of principal as disqualification of admissions by agent.*  In an action by a dealer who had shipped horses to a live stock commission company, all the capital stock of which except one share was owned by decedent, against the estate of

decedent personally for profits from the resale of such horses which had not been accounted for to such dealer, the claimant cannot testify as to conversations had with the manager of such commission company after the death of the principal stockholder where the theory of claimant's case is that the company was decedent personally and that hence his estate is liable and such theory necessarily makes the manager of the company the agent of decedent, since in such case the estate could not be bound by such agent's admissions.

TAYLOR, J., dissenting.

Appeal by claimant from the Circuit Court of Cook county; the Hon. THOMAS J. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1921. Affirmed. Opinion filed January 10, 1923. Rehearing denied January 25, 1923.

MASON BROTHERS, for appellant; HENRY B. MASON, of counsel.

GOODRICH, VINCENT & BRADLEY, for appellee; RALPH R. BRADLEY and FRANK L. WOLF, of counsel.

MR. PRESIDING JUSTICE THOMSON delivered the opinion of the court.

Byers W. Elder was a dealer in horses. The John S. Cooper Company was a corporation, doing a commission business at the Union stockyards in the City of Chicago. All of the capital stock of this corporation was owned by John S. Cooper, except one share. It was Elder's custom to buy horses out in the country and ship them in to the Union stockyards consigned to the Cooper Company, for sale by them as commission merchants, on his account. The parties engaged in many transactions of this kind up to Cooper's death in December, 1917. The probate court of Cook county issued letters testamentary in Cooper's estate on January 8, 1918, and one year later, on January 7, 1919, the claimant filed his claim against the Cooper estate in the probate court.

The basis of this claim was that Elder had learned that a large number of horses which he had shipped

to the Cooper Company for sale had been disposed of at prices from $10 to $20 higher than the prices at which the company had rendered an accounting to him; that Cooper & Company had thus defrauded him out of profits to the extent of approximately $240,000; that Cooper & Company were virtually John S. Cooper, and, therefore, the estate of the latter was liable to him to the extent of the profits which had thus been withheld.

A hearing was had on this claim in the probate court and at the close of all the claimant's evidence the court entered an order dismissing and disallowing the claim. An appeal was prayed from that order by Elder to the circuit court of Cook county and a trial *de novo* was had in that court, wherein, at the close of the claimant's evidence, the court instructed the jury to return a verdict finding the issues for the defendant estate, which was done. Judgment for the defendant was entered accordingly, from which the claimant has perfected this appeal.

The following facts are shown by the evidence as contained in the record introduced by the claimant in support of his claim.

For many years the claimant Elder had been buying horses in the northwest and shipping them to the Cooper Company to be sold by it for his account. Although the company financed Elder in all his business, Elder must be considered as the principal during his course of dealing with the company and the latter as his agent. On all sales made by the company for Elder, it charged him a commission of $3 and expenses for feeding and showing the horses at auction or private sale, as the case might be, and Elder always received for each horse the difference between the price he paid in the field and the price at which the Cooper Company sold the horse in Chicago, less the commission and expenses.

The evidence shows without contradiction that soon

after the advent of the World War, there was a great demand by the Allied Governments in Europe for horses to be used in war operations. Those governments entered into agreements with certain contractors to furnish these horses. As a practical matter, the only parties who could and did make these contracts with the Allied Governments, direct, were exporters located on the Atlantic seaboard, who had or could command transportation facilities across the Atlantic ocean for the contracts called for delivery in Europe. When these seaboard exporters made these contracts with the Allied Governments calling for a given number of horses to be delivered within a specified time, they in turn entered into agreements with subcontractors who undertook to procure horses from various dealers and deliver them at specified points for shipment to the exporters at the seaboard.

There was the keenest competition for these subcontracts. Some of the competitors of the Cooper Company in the Chicago stockyards, secured some of these war contracts. At the time this war business arose in the horse market in this country, Mr. Cooper was advanced in years and not in robust health and he, as virtually the sole owner of Cooper & Company, did not venture in what came to be known as the "war game," among horse dealers in the stockyards at Chicago. As a result, the volume of business done by the Cooper Company grew appreciably less as virtually all horses which could pass inspection were absorbed by those who had the war contracts.

At this time Chappell, who lived in Rochester, New York, and who had then secured certain war subcontracts with exporters or represented that he could get them, came to see Cooper and persuaded him to join him in the so-called war game, and they concluded a verbal arrangement whereby they were to take such of these subcontracts as they could secure and handle them as a partnership, dividing all profits and shar-

ing all losses equally. Cooper was personally to furnish all the money needed to finance the partnership and Chappell was to furnish his experience and to do the so-called field work at the seaboard, getting the subcontracts. This partnership continued in business in these war horse subcontracts from 1915 until Cooper died, late in 1917, and it was well known as being in that business in Chicago as the firm of Cooper & Chappell.

It is further shown by the evidence that when this war business in horses arose, the following custom in the handling of the business became established and prevailed throughout the period covered by the deals which are in controversy in these proceedings. Those firms which were in the business of supplying horses under such subcontracts as have been described, of which there were three in the Chicago market, so far as disclosed by the record, namely, Cooper & Chappell, Ellsworth & McNeil and Newgass & Company, established what were known as government inspections,— that is, each of them was assigned space by the Union Stockyards Company, at which horses they were offering under their subcontracts, were "shown" in the presence of inspectors representing the respective Allied Governments with which the contracts were had and at appointed times they would present horses for inspection. These were commonly referred to as the "inspections" of the different concerns named. Thus there came to be established and known in the Chicago market, and among all horse dealers, the "Cooper & Chappell Inspection." There was a large overhead expense involved in maintaining such an inspection,—such as the cost of what has been termed the field work at the seaboard among the exporters having contracts direct with the different Allied Governments by which subcontracts were obtained, and further the cost of maintaining a large force of hostlers, leaders, "busters" (needed to break green horses)

and others not necessary to mention. All such expense was borne by the firm maintaining the inspection. No horses were accepted under these subcontracts unless passed upon and approved by the government inspectors at these so-called inspections. It will readily be seen, and such was the case, as shown by the evidence, that no one had any chance to accomplish the sale of horses to the Allied Governments for war purposes through what might be termed the top-contractors, except those parties holding subcontracts and maintaining regular inspections. It was further the custom during this period for all commission merchants dealing in horses in the Union stockyards in Chicago, including the Cooper Company, to post from day to day, on bulletin boards at their stables and in their offices, the prices that were being offered for horses of the various grades, by the war subcontractors such as Cooper & Chappell, Ellsworth & McNeil and Newgass & Company, and to give further publicity to these announced prices, both the war subcontractors and the commission merchants sent bulletins broadcast over the country every day both by mail and by wire. In some instances, dealers in horses such as claimant was would send shipments in to commission houses such as the Cooper Company, and the latter would offer them to a war subcontractor such as Cooper & Chappell, and the latter would "show" them at their inspection and they would pass inspection, in which case the war subcontractor would pay the commission house for the horses at the then prevailing prices as announced in the manner above cited, and the commission house would account to the shipper for that selling price less expenses such as the yardage fee, which was charged by the Stockyards Company, feeding, etc., up to the time of inspection, and their commission charge of $3 per horse. The war subcontractor then turned the horses over to the top-contractor or exporter and his profit or loss was

represented by the difference between the price paid to the commission house for account of the shipper and that received by the subcontractor from the top-contractor or exporter less the inspection costs, to which reference has been made. In other instances, in order to fill out contracts on which they were short, the subcontractor would buy the horses from the shipper, through the commission house and pay for them, and then such as failed to pass inspection they fed up or doctored so as to bring them up to inspection requirements, or if that could not be done the subcontractor disposed of them elsewhere for whatever they would bring, which was always less than the contract price if they passed inspection. Any horses that died, either after the inspection and before delivery to the exporting contractor or after purchase by the subcontractor and before inspection, were of course losses borne by the subcontractor. The evidence shows that this custom prevailed throughout the period in question, not only in the Chicago market but all over the country.

The testimony in the record shows conclusively that all through the period in question the claimant knew all about the custom prevailing in the handling of these transactions in war horses and further that he knew all about the connection of Cooper with Chappell and the fact that they held subcontracts to supply war horses and, as such subcontractors were buying horses in the market, maintaining an inspection, and selling to the exporting contractors. It was shown by the testimony of the various witnesses that "the sale of horses in the yard at this period was practically all war horse sales * * * except the general sales that came from the misfits and rejects"; that the fact that Cooper & Chappell, and not Cooper & Company, were dealing in war subcontracts and maintaining an inspection in that connection, was well known in the Chicago market, and that Elder was in and out of Chicago

frequently during this time in connection with his horse business.

The witness Hunter testified about the partnership of Cooper & Chappell and the fact that they secured some of these war subcontracts and maintained an inspection in connection with that business; that horses consigned by Elder to Cooper & Company were inspected and some were passed at these inspections, and that Elder himself was present at some of these inspections; that Elder's brother was manager of horse sales for the Cooper Company and was in constant communication with claimant during this period, in the matter of the latter's shipments to the Cooper Company and their disposition; that this brother of the claimant "handled the sale of the horses from John S. Cooper Company to Cooper & Chappell"; that the claimant was in the yards from time to time during this period in conference with his brother. Certain letters written by the claimant to his brother during this period were put in evidence. In one, dated January 20, 1915, he wrote he had shipped some horses which were "all fat gunners." In this letter he asks his brother to send him "the sales on a card by using my numbers so I can get some line on how they are selling." In another letter dated March 7, 1915, he writes his brother that he is "going to keep the price down so that they can go to the auction and pay out if they don't get a war job." In another letter dated March 29, 1915, he asked his brother to try to get better prices on his best horses and says: "They are paying $210 for English horses in St. Louis. There is a man here buying English horses up to $200 for tops. He paid $170 and $180 for what I pay $140 and $150 for, so I can't keep the prices down and get any horses. * * * I will be apt to get a few horses here today but don't want to buy riders if you have no place for them." There were three classes of horses involved in this war business: AA,

heavy artillery, A, light artillery and C, the latter being known as "riders," an expression used by claimant in the last letter referred to. In another letter dated May 14, 1915, claimant writes his brother saying: "Your telegram regarding prices just received. At $110 and $140 we cannot furnish much.   *   *   * I will be apt to get quite a lot of good English horses. *   *   * Will horses have to ride same as Chicago, if so, I would have to get riders.   *   *   *   I don't like the prices and am not sure we can make much out of it. Will give it a trial." Chappell testified that he told Elder that Cooper and Chappell were taking his horses; that he talked with Elder about horses being sold at inspection nearly every time the witness was in Chicago; that there were such conversations in 1915; that in the spring of that year he talked with Elder "in regard to his horses. I asked him to ship in as many AA horses as possible, and said that I had taken a contract and there was a heavy percentage of AA horses and I said I hated to do this because knowing there were so many of the fellows furnishing smaller horses, what we call gunners,   *   *   *   and I wanted to make a special effort to get heavy artillery horses and he said he would." This witness told of another conversation with Elder in 1917 or late in 1916 when the latter was "apparently rather dissatisfied and was talking of shipping some horses to the Ellsworth & McNeil inspection. I talked with him when he came in and agreed to give him, I think, five dollars a head more for his heavy artillery horses than we were bidding, if he could make an effort to get heavy horses and ship them to us." Chappell testified further that nearly every time Elder came in they would have some conversation on the subject of this business; that he told Elder that John S. Cooper was interested with him in the purchase of his (Elder's) horses, and that Elder continued to ship horses to the Cooper Company after he knew Cooper had an

interest in the profits; that Elder had shipped to other inspections; that he had one of these inspections himself at one time in North Dakota, where he stood in the same position as Cooper & Chappell stood with regard to the shipments involved here; that the war subcontractors Cooper & Chappell, Ellsworth & McNeil and Newgass & Company, in accordance with the custom followed in this war business, daily posted the prices they were willing to pay for horses of the various grades and that these were the prices the shippers or sellers received; that he told Elder that he and Cooper had formed a partnership to furnish these horses to the various contractors. All this testimony was submitted by the claimant in support of his case. It shows clearly and without any equivocation, that Elder knew horses he shipped in to his commission merchant, the Cooper Company, were being bought by the partnership of Cooper & Chappell; that the latter were buying these horses to sell to the exporting contractors who had contracts with the Allied Governments. He knew all about the war contract business, and the inspections these necessitated; he maintained one himself for a time in North Dakota; he knew Cooper had an interest in this war contract business of Cooper & Chappell and he must have known that Cooper & Chappell were in the war contract business to make a profit out of it if they could.

It is argued that Elder's factor or agent Cooper was precluded by reason of the duty he owed Elder, as his factor or agent, from dealing in the subject-matter of the agency to his profit. That is wholly beside the question. Cooper was in no position to go into the war game himself. Old and feeble as he was, he could not engage in the wild scramble after these subcontracts. But no reason can be perceived why he was precluded from financing a younger and stronger man in the so-called war game, and enable him to secure some of those contracts and share the

profits with him if there were any. All these horses being sold for war purposes were being delivered to the exporters or top-contractors by those, and only by those, who secured subcontracts. Cooper could not get any himself. Chappell could. Cooper financed him on an agreement to divide profits and losses and in this connection they bought numbers of the horses shipped in to the Cooper Company by Elder for sale, and in turn sold them, with others, to their top-contractors, and Elder knew this was being done. As he knew all about it, and continued shipping his horses to the Cooper Company, he cannot be heard to say now that he never knew Cooper was making a profit on the turn-over from Cooper & Chappell to the exporters. But, in our opinion, Elder has no proper claim against the defendant estate, without regard to the question of the custom that prevailed during this period in the Chicago market and regardless of Elder's knowledge of the fact that Cooper was engaged with Chappell as subcontractor in dealing in horses in the Chicago market under that custom, and, in that connection, was handling some of Elder's horses.

The only obligation the Cooper Company, or Cooper personally, owed Elder, was to secure for him in the sale of the horses he shipped in to Chicago the best price available in the Chicago market. And, in getting the prices offered from time to time by the war subcontractors, Elder, according to all the evidence in the record, was getting the highest prices obtainable in that market. The evidence shows that the highest prices being paid for horses in the Chicago market during this period were prices being paid by these war subcontractors for horses that could pass the inspections. It must be remembered that the prices being paid by exporters or top-contractors could only be obtained by those who got subcontracts and who maintained the inspections and bore all the cost of those inspections, paying therefor out of their

profits. The prices being received by the subcontractors from the top-contractors were not available in the Chicago market to shippers such as Elder, nor commission houses such as the Cooper Company, nor to anyone else except to the subcontractors who went to the expense of getting the subcontracts and maintaining the regular government inspections. These subcontractors, Cooper & Chappell, Ellsworth & McNeil and Newgass & Company, were in competition all through this period in buying horses offered by the commission houses representing the shippers, and the prices they were paying for horses from day to day were the highest prices paid for horses in the Chicago stockyards. Elder does not claim he did not get those prices. But, he says he learned in 1918, after Cooper was dead and his partnership with Chappell at an end, for the first time, that Cooper & Chappell were selling to their top-contractors at a profit, and that Cooper had a share in that profit; that this was a fraud on him, and that inasmuch as the Cooper Company was virtually Cooper personally, his estate is liable for this fraud which was practiced on him and that he is entitled to the profit Cooper made. In view of the evidence the court was clearly right in holding the contrary as a matter of law.

As agents for the claimant Elder, it was the duty of the Cooper Company to sell all horses shipped in to them for Elder's account and secure for him the best prices obtainable in the Chicago market. Cooper & Company did so. The fact that those prices were being offered by the war subcontractors, one of which was Cooper & Chappell, in which firm Cooper had an interest,. and that certain of Elder's horses were sold to that partnership, and that the latter then disposed of the horses to the exporters, at a profit, does not give Elder any cause for complaint.

A number of procedural errors are urged by the claimant in further support of his contention that the

judgment of the circuit court should be reversed and the cause remanded to that court for another trial. The claimant was offered as a witness as to facts occurring prior to the death of John S. Cooper, but the court sustained objections, which were interposed to such testimony. It is the position of the claimant that he had been allowed to testify to such facts at the hearing in the probate court without objection and objection came too late when interposed at the trial in the circuit court. That contention is not tenable. The complainant was clearly an incompetent witness as to such facts under the statute. The trial in the circuit court was *de novo* and the attitude of the estate as to the plaintiff's testimony at the hearing in the probate court had nothing to do with its right to object to the testimony in the circuit court.

The claimant was asked certain questions for the purpose of showing that the first information he had to the effect that, as he claimed, he had not received all the money he should have, from the deceased, on the sales in question, came to him after Cooper's death, but the court sustained objections to those questions on the ground, as stated by the court, that the witness had already given testimony to that effect. As a matter of fact he had not previously so testified. This worked no harm to the claimant for the court passed on the cases presented by the claimant's testimony, as a matter of law, and in doing so the court considered that the claimant had so testified, and therefore the claimant got all the benefit, so far as the court's action was concerned, of the testimony sought to be introduced. We also have considered this case as though the claimant had given testimony to that effect.

When the claimant was on the witness stand he was asked if he had had any conversation with his brother, the manager of the Cooper Company, after the death of Cooper, with reference to prices at which his horses

had been accounted for by the Cooper Company during 1915, 1916, and 1917 (prior to Cooper's death), and objection to the question was sustained, and, in our opinion, rightly so. This question was based on the theory that claimant's brother was the agent for the Cooper Company, and, as such, the latter would be bound by any admissions he might have made. But claimant's entire case was based on the further theory that the Cooper Company was Cooper personally and thus his estate was liable just as Cooper himself would have been. But, on that theory, claimant's brother was the agent of the deceased, Cooper, and that agency terminated with the death of Cooper, and, consequently, any admissions such agent might have made after the death could not bind the defendant estate. Moreover, claimant was doubtless attempting to show that the prices at which the Cooper Company had accounted to him for his horses which had been sold to Cooper & Chappell were not the prices which the latter had received for them, a fact which was established by other testimony.

Complaint is also made of rulings of the trial court in sustaining objections interposed by the defendant estate to the introduction in evidence by the claimant of a certain contract purporting to be between the Cooper Company and other parties holding orders for horses from the British Remount Commission, and also certain minutes of director's meetings of the Cooper Company, held in January, 1918. In our opinion there was no error in these rulings. If these documents were material and pertinent, as claimant contends, the most he could have expected from them was that they would tend to impeach his own witnesses. In our opinion, neither the contract nor the director's minutes had anything to do with the issues involved here.

In our opinion, the evidence introduced by the claimant shows clearly that he has no valid claim against

the defendant estate, either in form or substance. We find no error in the record and, therefore, the judgment of the circuit court is affirmed.

*Affirmed.*

O'CONNOR, J., concurs.

MR. JUSTICE TAYLOR, dissenting: If A, an owner of horses, delivers them to B, a commission merchant at the Union stockyards, to sell for him, and B sells them but fails to account for $10,160 of the proceeds of those horses, B is liable to that extent to A. That is the formula of this case.

There is no evidence that the claimant by any act sanctioned Cooper's conduct in selling horses for more than the posted price and appropriating the difference. He did know something about the prices that were posted, also, that Cooper along with Chappell sold some of his horses as war horses. He knew the method of inspection and what it was for. There is no evidence, however, that he knew that the John S. Cooper Company was to allow his horses to be handled by the John S. Cooper Company in such a way that Cooper and Chappell were to have them inspected, and as soon as successfully inspected and branded, the title was to pass, not from him to the war contractor, but from him through the John S. Cooper Company acting as his agent, to Cooper and Chappell and then from Cooper and Chappell to the war contractors. Counsel for the estate argue that the evidence shows that a new custom of some kind arose, apparently meaning that the method of posting prices and having an inspection and sale to war contractors created a new order of doing business in regard to selling horses in the yards by commission merchants, and that as a result the claimant was bound by the prices posted on the bulletin board. There is no doubt but that the claimant in his dealings with the John S. Cooper Company would be bound by whatever the new custom was, if it were established by proof satisfactory to a jury.

In *Bailey v. Bensley*, 87 Ill. 556, the court said, where a question arose as to the usage and customs of commission men doing business on the Board of Trade of Chicago:

"A person who deals in a particular market must be taken to deal according to the known, general and uniform custom or usage of that market; and he who employs another to act for him at a particular place or market, must be taken as intending that the business to be done will be done according to the usage and custom of that place or market, whether the principal in fact knew of the usage or custom or not."

In the instant case, however, there is no evidence that a new custom was established by which it was a recognized rule that commission merchants might deal in their consignors' horses and only account for the prices which were posted, even though the commission merchants sold the horses for higher prices.

If there were evidence that the claimant knew not only the posted prices, but assented in some overt way, such a way that would bind or estop him; and evidence that he overtly sanctioned John S. Cooper—who in reality was the John S. Cooper Company—selling his horses at higher prices than were posted and appropriating not only the customary $3 per head commission, but all above the posted price which was paid by the war contractors, and not only such evidence, but sufficient, in the eye of the law, to justify the trial judge in concluding that he was bound or estopped and not entitled to more than the posted price, then the jury were properly instructed. But such is not the record. The most indulgent construction of the testimony of Chappell and the other witnesses does not lead to that conclusion.

Nowhere does the evidence show that the claimant understood or was informed that if his horses, which he shipped into the Union stockyards consigned to the John S. Cooper Company, were sold by John S. Cooper or Cooper and Chappell for more than the posted

price that he would not be entitled to the extra amount, less appropriate necessary expenses. Counsel for the estate argue that as W. L. Elder, the brother of the claimant, was the manager of the sales department of the John S. Cooper Company during the period in question; as the claimant, himself, from time to time, frequently during the three years of war sales, was at the Union stockyards in the matter of horses shipped in to the John S. Cooper Company and talked with his brother; as the claimant was in constant communication with him by mail; as the claimant shipped horses which were sold through inspections made by other commission merchants at the Union stockyards, namely, Ellsworth & McNeil and Newgass & Company, as Chappell testified that on one occasion—the time is not given—he told claimant that John S. Cooper was interested "with him in the purchase of his horses; and that he, Cooper and Chappell, had formed a partnership in the matter of the sale and furnishing of horses to various Allied Government contractors"; as certain letters and a telegram written by the claimant suggest or show that the claimant knew that some of the horses that he shipped in would be sold as war horses, it necessarily shows that the claimant knew of the existence of a so-called "war time custom and usage prevailing in the Union stockyards during the years from 1915 to 1918, both inclusive, and that his shipments were included in the Union stockyards under such usage and custom." Quite obviously, whether that argument is sound depends upon a careful consideration and analysis of considerable and voluminous evidence. The deduction, which counsel for the estate makes from the evidence concerning the so-called new custom and the claimant's knowledge of it does not appear to be in any way justified, and in such a case, under the law, the evidence should have been submitted to the jury. It is by no means a case where there is no evidence in support of the claimant's charge.

The evidence of Hunter, the bookkeeper, who produced a statement purporting to show all of the claimant's horses that were shipped the John S. Cooper Company and which passed the inspection and were accepted by government contractors, is that Cooper and Chappell received at least $10,160 on the sale of 1,563 of the claimant's horses in excess of the amount which the claimant was credited with by the John S. Cooper Company.

Counsel for the estate argue that the evidence of Hunter, elicited on cross-examination, is to the effect that his figures do not tell whether there was any profit to Cooper and Chappell from the sale of the claimant's horses; that, considering all the claimant's horses that were shipped in, 4,234 of which failed to pass inspection, Cooper and Chappell may not ultimately have made any profit at all. The claimant, however, made out a prima facie case, assuming he had not bound himself by the prices that were posted on the bulletin board, when he showed that on 1,563 of the horses which he shipped in he did not receive or was not credited with the actual prices at which they were sold.

The John S. Cooper Company acted as a factor or commission merchant, those terms being usually considered practically synonymous. The former title is usually the legal one and the latter the popular one. "A factor is one whose business it is to receive and sell goods for a commission. He differs from a broker in that he is entrusted with the possession of the goods to be sold and usually sells in his own name." Mecham on Agency (2nd Ed.), sec. 2497.

The John S. Cooper Company, therefore, occupied a fiduciary relation to the claimant and as such was bound to observe the utmost good faith in its dealings with him. In *Hafner v. Herron*, 165 Ill. 242, the court said: "There is a want of good faith on the part of the agent towards his principal, when he acts adverse-

ly to his principal's interest, or where, representing the seller, he conceals from him an arrangement intended for the advantage of the buyer." Citing Story on Agency, sec. 334. In the same case the court quotes with approval from *Young v. Hughes*, 32 N. J. Eq. 372, the following language: "It matters not, that there was no fraud meant, and no injury done, the rule is not intended to be remedial of actual wrong, but preventing of the possibility of it. *It is the law that where an agent is employed to make and consummate a sale and in doing so is guilty of bad faith to his principal he forfeits his commissions or compensations.*" In the instant case not only was the John S. Cooper Company bound in good faith to endeavor to obtain the highest prices for the claimant's horses and bound to account for all that was received as the result of the sale of the claimant's horses less certain expenses and the commission, it was also bound to act solely and fully as the agent of the claimant in selling his horses and not as agent for Cooper and Chappell in the purchase of the claimant's horses. Considering John S. Cooper, as we do, the same as the John S. Cooper Company, he could not on the one hand be entitled to sell the claimant's horses at the price posted and then as a member of the firm of the John S. Cooper Company buy them at the price posted and also as a member of the firm of Cooper and Chappell sell them to the war contractors at some other price. John S. Cooper's duty, as the John S. Cooper Company, to the claimant was inconsistent with his duty as a member of the firm of Cooper and Chappell. It was improper for John S. Cooper to accept money through Cooper and Chappell growing out of the sale of the claimant's horses while he was acting in the name of the John S. Cooper Company. While being the agent or consignee of the claimant, the very formation of the copartnership between Cooper and Chappell was inimical to the interests of the regular customers or consignors of John S. Cooper Company.

It may be that Cooper did not intend to obtain an unlawful profit; but that is immaterial here, the only pertinent question being, is there evidence that he got and retained money which belonged to his principal?

Cooper had no more right to make an extra profit out of the sale of claimant's horses than the receiver had in *Ravlin v. Chicago, A. & DeK. R. Co.*, 297 Ill. 130, out of the sales of securities of the railroad company while he was acting as its receiver. In that case the court said:

"Having concluded from an examination of the contracts and from the evidence that plaintiff in error made a profit out of the sale of the securities of the railroad company while he was acting as its receiver, but one result can be reached. When a person accepts an appointment as receiver he must not permit his personal interests to in anywise conflict with his duty in that respect. It is well settled that a receiver can make no profit out of his trust other than the compensation which the court may allow him under the law. He cannot deal with the property involved for himself while he is receiver, and if he does, the benefit must inure to the trust estate. It makes no difference if the company for which he is receiver was not a loser in the transaction nor however free from fraud the transaction may be."

What Cooper held out of the proceeds from any of Elder's horses belonged to Elder as part of the price gotten by his agent for his horses. Neither Cooper nor Cooper & Chappell could buy Elder's horses when they both knew that they were Elder's property delivered to Cooper that he might act in Elder's stead and get the most money for them. Cooper's duty as a commission merchant was towards his principal and not himself. No commission merchant to whom horses are sent to be sold and turned into money can sell the horses to himself upon the one hand at what he may be pleased to call the highest price and then on the other hand sell them to a third person for more and

Elder v. Cooper, 227 Ill. App. 332.

retain the difference.    Cooper could not act at the same moment as both agent and principal in regard to the claimant's property.    Of course there was no such thing as a custom established which could in any way change the duties and obligations of a commission merchant to his principal.    A mere method of inspection of horses, a little more elaborate than was usual, which had not existed before, and a posting of prices on bulletin boards, in no way altered the obligation of Cooper to his principal.    If Cooper sold Elder's horses at the price posted to a third person, such as a war contractor, and in doing so was getting for Elder all that could reasonably be obtained in the market for those horses, then Cooper would only have to account for what he received which would be the same as the price that was posted, but if he got more, and Hunter, his own bookkeeper says he got $10,160 more, he was liable for that amount, and the proof so shows in this case.

There is not a word of evidence that Elder knew Cooper was making a rake-off, an extra profit, on his, Elder's horses.    And there is no evidence that by any overt act of any kind he sanctioned such conduct on the part of his agent, Cooper.    It is admitted in the majority opinion that Cooper shared equally with Chappell in an extra profit made out of Elder's horses. What legal right did Cooper have, as a commission merchant, not having title to the horses, being employed, as he was, to get all he could for his principal, to take part of the money received for horses that were not his, and not account to his principal?    It was a flagrant breach of trust, a source of "graft," that the law has always condemned.    No blame attaches to Chappell, save as he may have connived at it.    That Cooper was old is no excuse.    That the conventional horse business was poor, and that it was advisable that Elder's horses should be submitted to war subcontractors, so they might have a better chance of

being sold, in an otherwise dull market, did not change Cooper's status as a commission merchant, or entitle him to make an extra profit, or entitle him to deal with Elder's horses as though he were a principal. He could not, at the same time, be an agent and principal.

If a commission merchant were allowed with impunity to deal in the commodity sent him by his principal and secretly pocket an extra profit, it would at once put an end to that confidence which the principal, under the law, is now entitled to repose in his agent, and would destroy one of the most beneficial commercial relations in the whole business world. Instead of the law tending to bring about less confidence it ought, in the interests of commerce and morals as well, to inspire it.

Considering what the evidence in this case affirmatively shows, and without contradiction, it follows, in my opinion, as a matter of law, that the evidence not only merely tended but proved the justice of Elder's claim, and, that being so, the evidence should have been submitted to the jury. As the uncontradicted evidence of Hunter, Cooper's bookkeeper, is that Cooper received for the sale of Elder's horses, $10,160 more than he accounted for or credited to Elder, quite obviously Elder made out a prima facie case.