In re LOS ANGELES LUMBER PRODUCTS CO., Ltd.

No. 31352.

District Court, S. D. California, Central Division.

Sept. 29, 1941.

Gibson, Dunn & Crutcher, of Los Angeles, Cal., for debtor.

Warren E. Libby, of Los Angeles, Cal., for bondholders' committee.

George R. Larwill and Frank S. Balthis, Jr., both of Los Angeles, Cal., for intervening bondholders.

Faries & McDowell, of Los Angeles, Cal., for David R. Faries.

Dryer, Richards & Page, of Los Angeles, Cal., for District Bond Co. and Deposited Bonds & Shares Corporation.

Chas. F. Johnson, of Los Angeles, Cal., for SEC.

Thomas K. Case, of Los Angeles, Cal., in pro. per.

William Schoenau, Jr., of Los Angeles, Cal., in pro. per.

JENNEY, District Judge.

This matter is before the court, primarily, upon the petition of a Bondholders' Committee filed February 19, 1940, now joined in by debtor, praying for the cancellation or reduction of certain claims on debtor's bonds, filed by David R. Faries. The bonds of debtor herein referred to are in most instances represented by Trust Certificates or Certificates of Deposit for Trust Certificates, which, for convenience, will be herein referred to as "bonds of debtor", without attempting to distinguish such certificates from actual bonds.

On February 23, 1940, the court issued an order restraining the disposition of any bonds acquired by Mr. Faries subsequent to June 30, 1936, until hearings could be held and a decision reached upon this petition. At the request of all counsel this decision has been delayed from time to time in order that additional briefs might be filed. On October 12, 1940, Mr. Faries filed a petition praying for an order approving the purchase of these bonds. Another petition by Mr. Faries filed November 7, 1940, asks approval by the court of the proposed sale to Annie K. Borbridge of one certificate of deposit representing a one-thousand-dollar bond and two shares of the class "B" stock. On February 3, 1941, District Bond Company, a corporation, filed a petition requesting that the restraining order of February 23, 1940, be dissolved as to $67,500 principal amount of bonds which it alleged was its share of bonds purchased by it in joint account with Mr. Faries. This petition was denied. All of the bonds in question are now in possession of the court by virtue of an order issued March 6, 1941, impounding the same.

The court, by appropriate orders, has heretofore confirmed debtor's plan of reorganization dated February 1, 1940. At the request of all counsel, confirmation of the plan did not await the outcome of legal questions arising in connection with these claims on bonds owned by Mr. Faries or held by him in joint account. The plan of reorganization has been made sufficiently elastic to provide for any disposition of these claims which the court may desire to make. The reorganization has been proceeded with, a new company has been organized and is now actively engaged in carrying on the business of debtor under a new Board of Directors approved by the court. As a matter of fact, the company has made tremendous strides under present management and is engaged in filling government orders for navy ships and facilities in an amount of approximately $81,839,700.

Hearings in connection with the bond claims of Mr. Faries were held before Special Master Reuben G. Hunt. District Bond Company did not actively participate in these hearings, except that certain of its officers and employees appeared as witnesses. At the conclusion of these hearings all parties, except District Bond Company, entered into a Stipulation of Facts dated August 27, 1940. This stipulation was approved by the Special Master and it was agreed that the court might consider the same in arriving at its decision herein.

Hearings were held before United States District Judge James Alger Fee of Portland, Oregon, in connection with the bonds of debtor held by Mr. Faries and District Bond Company in joint account. Following that hearing Judge Fee signed findings of fact, conclusions of law and a decree under date of March 6, 1941, all of which were approved by counsel for the bondholders' committee, the debtor, Mr. Faries, District Bond Company and Securities and Exchange Commission. Paragraph IV of the decree specifically reserves for decision by this court all questions as to the legal effect upon Mr. Faries or District Bond Company or its subsidiary of or growing out of any of the acts and things so found and set forth in said findings. The Commission is participating in this proceeding with the approval of this Court, pursuant to the provisions of Section 208 of the Bankruptcy Act of 1898, as amended by the Chandler Act of 1938, 11 U.S.C.A. § 608.

This court has heretofore rendered its opinion in connection with the application of Messrs. Faries and McDowell for attorneys' fees in connection with this proceeding: In re Los Angeles Lumber Products Co., 37 F.Supp. 708. At the request of Messrs. Faries and McDowell this decision was temporarily vacated by order of this court dated March 31, 1941, pending the filing of further briefs. This matter is likewise now before this court for decision.

The court room is pretty well filled with bondholders, all of the officers and directors of debtor corporation, lawyers, brokers, bankers, trust officers and others who are directly or indirectly interested in these proceedings or in this decision of the court. We shall therefore discuss the problems presented somewhat informally and more fully than would ordinarily be necessary.

We believe also that a full statement of the facts, upon which the court's decision is predicated, should be made. Many of those present are either not entirely familiar with what has transpired or have perhaps overlooked the legal significance thereof. In making the following statement of facts, we shall try, in so far as is possible, to follow the wording of the stipulation of facts dated August 27, 1940 and the Findings of Fact of Judge Fee under date of March 6, 1941.

Prior to assuming any official position with debtor, or its predecessors in interest, David R. Faries had represented certain holders of debtor's bonds and was a member, secretary and counsel of an informal bondholders' committee. An immediate reorganization of debtor company was then contemplated. Because of his familiarity with debtor's problems and because he had theretofore so represented bondholders, Mr. Faries was, on June 29, 1936, elected a director and vice-president. Through appointment of his law firm of Faries and McDowell as counsel for debtor, Mr. Faries became its chief counsel. These three relationships continued from June 29, 1936 to April 15, 1940. Thereafter, except in matters in which he or his firm were interested, Mr. Faries and his firm continued to act as counsel for debtor until December 31, 1940. Mr. Faries has personally appeared in this case, as one of the attorneys for debtor, at many hearings and proceedings before the court and before the special master.

Subsequent to his election as director and vice-president and his appointment as attorney, but prior to the actual commencement of these proceedings, Mr. Faries purchased for his own account $14,500 principal amount of debtor's bonds, paying therefor the sum of $1,521.10. These purchases were all made between July 10 and December 23, 1937. Each of the purchases was made at going market prices by J. Clifford Argue, one of Mr. Faries' associates in the law firm of Faries and McDowell. Mr. Argue told brokers to deliver bonds so purchased to T. M. Wurts for payment. Mr. Wurts was at that time employed as an auditor in the offices of Faries and McDowell. Said Wurts, upon instructions from Mr. Argue, but without having consulted Mr. Faries, registered the same in his own name and deposited the bonds with the duly appointed depositary in favor of the plan of reorganization of May 24, 1937, then pending.

82

Prior to the purchase of these bonds, Mr. Faries had been purchasing bonds for the account of debtor from funds derived from the sale of some of the properties of Masset Timber Company, a subsidiary. These said funds were exhausted on or about July 6, 1937, and no other funds of debtor were available for the purchase of bonds, except possibly a fund in the possession of Security-First National Bank of Los Angeles, as trustee, of approximately $2,900, which had likewise been derived from the sale of properties of Masset Timber Company. Debtor's board of directors had under contemplation the release of these funds for use in the purchase of additional bonds and had instructed its attorneys, Messrs. Faries and McDowell, to attempt to obtain the release thereof for that purpose.

Mr. Faries purchased the $14,500 principal amount of bonds with the intention of delivering them to debtor, if said fund was released, or keeping them himself if said fund could not be so released. Mr. Argue had instructed Mr. Wurts to register them in his own name until that question was determined. It does not appear however that this fund was ever so released. The purchase of these bonds, or any of them, by Mr. Faries personally was not taken up as a matter of business at any directors' meeting or with the court, nor were they subsequently approved by the board or by the court. However, immediately following a regular meeting Mr. Faries informed Directors Powell, Spicer, Bagley and Watson, and also Secretary Ingoldsby, that he intended to buy some bonds for his own account if the debtor could not buy them. Three directors and the secretary testified at the hearing before the special master that they had heard from time to time that Mr. Faries was buying bonds.

The filing of the petition for cancellation or reduction of Mr. Faries' claim now before the court was the first intimation that reached the court of these or subsequent purchases on the market.

At a meeting of the board of directors of debtor held on December 23, 1936, a resolution was adopted authorizing a reorganization, either by a private reorganization with the consent of interested parties or by a proceeding under Section 77B of the National Bankruptcy Act as amended. The exact method of procedure was to be determined by the board. A permit was secured from the Department of Corporations of the State of California in June, 1937,

authorizing the solicitation of debtor's security holders for consents to the plan of reorganization called the "Plan of May 24, 1937". At all times herein mentioned debtor was hopelessly insolvent.

During the period from June, 1937, to April 13, 1938, consents were solicited by debtor through Allen C. Stelle, now appearing in this proceeding as Chairman of the Bondholders' Protective Committee. Mr. Stelle worked out of the law office of Faries and McDowell and under the supervision of Mr. Faries and his associate, Mr. Argue. On December 16, 1937, the board of directors concluded that sufficient consents could not be obtained for voluntary reorganization. The board then passed a resolution directing the company's attorneys to file a petition for reorganization under said Section 77B, 11 U.S.C.A. § 207. The petition, filed January 28, 1938, was prepared and signed by Faries and McDowell, by Mr. Argue. The plan of reorganization of May 24, 1937, was made a part of that petition and was attached thereto. On that day the late Judge William P. James of this court made an order continuing debtor in possession and this order has remained in effect throughout these entire proceedings, debtor being in continued possession of its assets and business, the directors, being; however, changed from time to time.

Subsequent to the commencement of the proceedings, and during the pendency thereof, and while the debtor was so continued in possession, and while he was acting as attorney for such debtor (being also a director and vice-president), Mr. Faries purchased in his own name $116,000 principal amount of bonds, paying therefor $24,389.60. Each of the purchases was made on the open market from brokers at going market prices, except $12,500 principal amount of bonds, which were acquired from the secretary of C. C. Spicer, the then president of the corporation. Mr. Faries stated that one of his objectives in so buying bonds was to further the proposed plan of reorganization and he caused each of the bonds so purchased, which had not already been so voted and deposited, to be voted in favor of the pending plan of May 24, 1937, and to be deposited with the depositary in accordance therewith. Mr. Faries further states in his brief of September 14, 1940, that a large majority of the bonds were purchased from persons who had refused to consent to the plan of reorganization of May 24, 1937. (It is significant to note here that the

Supreme Court of the United States ultimately declared that as a matter of law this plan was not fair and equitable, and therefore rejected it. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110.) Some of the holders of the bonds so purchased had assented to a prior plan of reorganization of 1930 and had deposited in accordance therewith, agreeing to a reduction in their interest rate. Others had not.

Shortly prior to January 18, 1940, Mr. Faries was considering the purchase of $4,000 principal amount of bonds owned by Mr. Spicer, then president of debtor, and $106,000 principal amount owned or held by friends or associates of Mr. Spicer. Mr. Faries felt that these purchases were necessary to his re-election because he had learned that Mr. Warren Libby, attorney for the bondholders' committee, and Mr. Stelle, the chairman, were trying to keep him off the board. To that end, Mr. Faries negotiated with District Bond Company, a licensed broker and dealer in securities, for financial assistance, and opened a joint account with that company. The purchases were then made in joint account. During the period of these purchases Mr. Faries was a stockholder of District Bond Company, owning less than 2% of the capital stock, and was a director thereof. He was, however, apparently not acting as its attorney in these transactions. Subsequent to the purchase from the Spicer interests, of $110,000 principal amount of bonds, additional bonds were purchased from others for the joint account. A total of $136,500 principal amount of bonds, inclusive of the Borbridge bond, were thus purchased under this joint account at a cost of $45,505. Mr. Faries states that his objects in purchasing these additional bonds were to secure harmony in the board, to assure his election to that board and to make a profit out of the purchases.

Neither these joint account purchases nor any other purchases were ever taken up as a matter of business at any directors' meeting or with the court, nor were they subsequently approved by the board of directors or by the court.

Judge Fee's findings and conclusions show:

"That at the time of the creation of this joint account and at all times subsequent thereto, the District Bond Company and its President, Mr. Nels Gross, and Deposited Bonds & Shares Corporation, a subsidiary, and its president, Mr. Nels Gross, knew that David R. Faries was one of the attorneys for and a member of the Board of Directors of the Debtor; that Mr. Gross had read the Debtor's Plan of Reorganization dated May 24, 1937, and knew of some dissatisfaction with the services of the then President of Debtor and entered into the arrangement for the purchase of bonds in said joint account for the purpose of obtaining the removal of the then President and procuring the selection of a new President and for the purpose of retaining David R. Faries as a director of Debtor corporation; that he knew of the pendency of the above entitled reorganization proceedings; that District Bond Company and Deposited Bonds & Shares Corporation are charged with and bound by the knowledge of all of the facts concerning which their President, Mr. Nels Gross, and their other officers, servants and employees possessed and by the acts of all their agents within the scope of their authority. * * *

"That with full knowledge of all of the matters set out in Paragraph 3 (the paragraph just quoted) of these findings District Bond Company made an agreement with David R. Faries for a joint account under terms of which District Bond Company was to furnish moneys to the amount of the total purchase price of bonds purchased therein and that all bonds therein were to be held by the District Bond Company as collateral security for the funds advanced by District Bond Company in said joint account; that each of the parties to the joint account was to be charged with and liable for one half of the losses and was to be entitled to one half of any profits therefrom; that irrespective of the name or names in which the trust certificates or certificates of deposit for trust certificates evidencing bonds are registered that said David R. Faries and said District Bond Company own jointly each and all bonds acquired in said joint account; that the term 'joint account' as used in the said agreement and arrangement between said parties, David R. Faries and District Bond Company, meant and as between the parties created in said parties a joint title and joint ownership in the bonds acquired in said joint account and each party thereto thus acquired and now has an undivided interest in each and all of the bonds of Debtor purchased in said joint account; that said

Trust Certificate No. 83 in favor of Annie K. Borbridge was originally purchased in said joint account and was delivered to said David R. Faries on April 12, 1940 under a receipt stating 'The above certificate to be held by you subject to release on payment to us of $320.00.' and is now in the possession of said David R. Faries."

Apparently from the beginning of his bond purchases, Mr. Faries advised all bondholders of debtor, who inquired of him, not to sell their bonds unless they had to. However, while some or all of the information received by Mr. Faries might have been obtained by bondholders if they had inquired of the proper sources, no definite attempt was made by Mr. Faries or by other members of the board to keep security holders advised from time to time of developments. During the entire period of these purchases Mr. Faries has had complete information concerning all appraisals made of the property and the assets of debtor and its subsidiaries and of all financial statements which were furnished monthly to the directors. In letters sent to all security holders under dates of June 12, 1937, and July 9, 1937, respectively, security holders were advised that if further information was desired, they should contact David R. Faries, at a given address or over a given telephone number.

On or about January 20, 1940, Mr. Faries participated in the preparation of a letter upon the letterhead of District Bond Company signed by that company. The letter stated: "We have clients who are interested in acquiring some Los Angeles Lumber Products bonds". It further stated that since January 1, 1940, bonds were selling in the Los Angeles market at prices ranging from 28 to 34 cents on the dollar. A card with blanks to be filled in by the bondholders accompanied the letter. When completed the cards constituted offers by bondholders to sell their bonds to District Bond Company. The letters with the return postcards enclosed were mailed from the offices of Faries and McDowell to many bondholders of the debtor between January 20, 1940, and February 19, 1940. For whose account the purchases were to be made, or were made, was not revealed. At least two bonds of debtor were purchased by Mr. Faries at prices quoted on return postcards, and as a result of such solicitation. Mrs. Annie K.

Borbridge signed a card quoting a price of thirty-two cents on the dollar. She testified that she did not wish to deliver her bond to the salesman for District Bond Company, but that the salesman insisted upon delivery, and that she did deliver and sell her bond to District Bond Company on or about February 2, 1940. She further testified that she did not know at that time that the bond was bought for Mr. Faries. The bond was placed in the joint account. Mr. Faries offered, in open court, to return the bond to Mrs. Borbridge at his cost if the court would permit it.

On February 27, 1940, eight days after the filing of the petition of bondholders' committee for cancellation or reduction of his bond claim now before us, Mr. Faries addressed a letter to debtor, offering to sell his bonds to the debtor. The offer provided that if the court was of the opinion that debtor could legally purchase the bonds and that it was good business so to do, Mr. Faries would sell the bonds at cost, plus interest at the rate of 6% per annum on his expenditures and plus such other sum, if any, as this court might deem a proper allowance for the time and effort expended in gathering them together. A similar offer was made in Mr. Faries' answer to the petition of the bondholders' committee.

The debtor's board of directors, by resolution, decided that even if they could legally do so it would not be for the best interest of the debtor to purchase the bonds, and that debtor had no funds available for that purpose. This action was informally reported to the court in connection with hearings on the plan of reorganization, and the court approved the action of the board in so declining to purchase the bonds. The court then stated that, regardless of any legal question as to the corporation's right to buy these bonds, he felt that there was an element of speculation in the transaction in which the debtor should not indulge. He called attention, also, to the fact that with its expanding program the corporation would be vitally in need of ready cash. In giving such approval, however, the court made it clear that such approval was without prejudice, and was not to preclude any right or remedy which the corporation or its creditors might have in connection with the Faries bond claims.

Mr. Faries was present in court but made no objection to the court's reser-

vation of rights, nor did he indicate that he considered the same improper. The court, in making this reservation, stated that the facts remained to be determined, that there must still be decided the question of the liability of a director, as a trustee, to account for any profits or for a breach of trust. He then called attention to the fact that such trustee might ultimately be limited in his claim to the cost of the bonds either with or without interest on the cost, but stated that he was at that time deciding just one matter, namely, the rejection of the offer by Mr. Faries to sell his bonds.

The court proceeded to arrange for hearings upon the entire matter in order to determine the facts and ordered the filing of briefs by all interested parties. Complete hearings were held, and from March 25, 1940, to September 9, 1941, twenty-one separate briefs, totaling several hundred pages, were filed. Final decision has been postponed, from time to time, until this date, at the request of all counsel. The last brief on behalf of Mr. Faries was filed August 21, 1941, and the last reply thereto was filed September 8, 1941.

Mr. Faries has consistently adopted the position that in purchasing bonds he had acted openly and well within his rights; that the fact that he had so purchased bonds was a matter of record in the office of the trustee under the bond indenture, that he had violated no fiduciary obligation in so doing and had in fact done no wrong. The court declined to remove Mr. Faries or his firm as one to the attorneys for debtor until an investigation of the matter could be made to determine all the facts and full hearings thereon had been completed. In that connection the court stated: "I think this—and I say so very frankly— regardless of any propriety or impropriety in the actions of Mr. Faries—I think that pending a determination of the matter, since Mr. Faries requests to be relieved of any responsibility as an attorney in the hearing (the hearing on his bond claims), that request should be granted, and it has been granted. I am inclined to the view that he should resign from the board of directors—as one of the trustees—until this matter has been finally disposed of. I do not make this as an order of the Court. I feel that it is probably a position which he will prefer to take."

After the Supreme Court of the United States had rejected the plan of May 24, 1937, as previously herein indicated, debtor, through its attorneys, Faries and Mc-Dowell, filed an amended plan under the terms of which all of the stock in the new corporation to which the assets and business of debtor were to be transferred was to be owned by bondholders, and the old shareholders were given no participation. When this amended petition was presented to the court for approval no distinction whatsoever was made between the holdings of bondholders who had originally assented to the 1930 plan and the holdings of bondholders who had refused to assent to the plan. The court called attention of counsel for the debtor to the fact that those bondholders who had originally assented had voluntarily agreed to a reduction from 7½% per annum to 6% per annum in the interest rate from date of default, but that nonassenters had not agreed to this reduction. Therefore, by order of court, the plan was amended to give an additional interest in the new corporation to nonassenters in proportion to their additional interest claims. This matter will be more fully discussed later. All claims filed on bonds have been allowed with the exception of the claims now before the court.

Proceedings on the Faries bond claims and on the petition of Faries and Mc-Dowell for compensation have been continued from time to time at the request of counsel. As previously stated, this court on February 8, 1941, rendered its opinion declining to allow Mr. Faries or Messrs. Faries and McDowell any compensation as attorneys. (In re Los Angeles Lumber Products Co., 37 F.Supp. 708.)

With these facts in mind, let us consider Mr. Faries' own analysis of his legal position.

Mr. Faries concedes that, within certain limitations, an attorney, officer and director, for a debtor in possession under Section 77B of the National Bankruptcy Act, stands in a fiduciary relationship with the creditors of the debtor. The mere fact that he was a fiduciary for some purposes, he contends, is not in itself sufficient cause for the establishment of a constructive trust with respect to the bonds purchased by him. He urges that many other elements must be present:

First: "It must clearly appear that the purchase of the bonds was in violation of his trust as a fiduciary." He insists that an attorney, officer and director of a corporation "is a fiduciary only with respect

to those matters for which he is bound to act on behalf of the corporation"; that the debtor was not in the market for the bonds, having no available funds, that it was not his duty to buy them for the corporation; and that he breached no duty when he bought them for himself. Further, he maintains "that debtor and its attorney owe no duty to the bondholders other than to safely keep and conserve the property and to properly and efficiently operate the business"; therefore, the purchase of the bonds was not in violation of any duty owing either to debtor or its creditors.

Second: It must be shown that the purchases were to the disadvantage, detriment, damage or injury of his cestui que trust. He states that the debtor was not damaged in any way by his purchases; that the only change which occurred was that the corporation owed him instead of other persons, its total obligations remaining exactly the same as theretofore; and that, as a matter of fact, the debtor was actually benefited because the bonds came into "friendly hands"—hands favorable to the plan of reorganization.

Third: It must be shown that the bonds were purchased at a discount and that he made a profit for himself out of the transaction. He insists that the bonds were not purchased at a discount; that they were bought at current prices in the open market; that they were not due and there was no plan to liquidate them; that they were not to be paid under the proposed plan but were to be exchanged for stock in a new company, each bondholder receiving his pro rata number of shares; that the value which these shares would have was problematical and that no one knew whether or not the plan would be approved by the District Court, by the Circuit Court of Appeals or by the Supreme Court, or would be successful if so approved, and that he could not at any time determine whether or not he had made a profit as there was not sufficient market to absorb all of his bonds, or any considerable number of them.

Mr. Faries further contends that, even assuming that his purchases of bonds could be considered as a violation of his duty as trustee, his acts in that regard were not void, but merely voidable, at the option of debtor; and that debtor's refusal to take steps toward voiding those acts constituted a waiver and ratification thereof. In other words, by refusing to accept his offer to sell these bonds, the directors of debtor

elected not to consider his acts as those performed for the benefit of the corporation, but as acts performed for his own account. Therefore, having exercised its election, debtor is now estopped from declaring a constructive trust.

In this connection, Mr. Faries insists that, even assuming, just by way of argument, (1) that a constructive trust could be declared, (2) that the right has not been waived, and (3) that the trustees are entitled to enforce it, Mr. Faries is still entitled to be paid, in cash, the actual cost of said bonds, plus interest and plus, also, the reasonable cost of acquiring the same; and that debtor has no legal right to pay him in stock of the new corporation, or to otherwise limit his claim.

Mr. Faries' concluding argument by way of summary is that, through the application of fundamental principles of equity jurisprudence, his claim under these bonds should be recognized in exactly the same way as claims on all other bonds. He says that his purchases were made in the best of faith, openly and at current market prices; that, while no formal presentation of the matter was made to the board of directors as such, most of the officers and directors knew of these purchases; that debtor has not been harmed in any way by the change of ownership—in fact, it has benefited by having him take over bonds from recalcitrant bondholders—that he has been at all times trying to help the debtor corporation perfect and accomplish its proposed reorganization; that the fight against him has been instigated and conducted by Mr. Stelle, who was angry at being discharged as secretary of the corporation, and by a small group led by Mr. Stelle who have been trying to harass him, and to get control of the corporation; that under these circumstances it would be most inequitable and unjust to treat him in any different way than other bondholders are treated.

Many of the cases cited in support of claimant's position are cases involving the relationship between an attorney, director or officer on the one hand and a solvent corporation on the other. The principles of law governing these cases are manifestly quite different from the principles of law involved when the corporation is insolvent. Some of the cases also cited by claimant involve the question of the responsibility of a trustee of an ordinary bankrupt estate in which the interests of

unsecured creditors are primarily involved. Let us then attempt to determine the principles of law applicable to the case at bar and apply them to the established facts.

Section 77B was added to the National Bankruptcy Act to facilitate the reorganization of a corporation during the time it is functioning as a going concern. As the reported cases clearly show, many abuses have occurred in corporate reorganizations—some due to avarice but most due to a lack of understanding by trustees of their legal and moral responsibilities. It took some time for these cases to be presented for decision and for the courts to speak. When they did speak they made it clear that Congress intended by the provisions of said Section 77B to hold trustees to a high degree of both moral and legal responsibility.

Generally speaking, the directors of a debtor in possession under Section 77B have the same powers and have imposed upon them the same duties as trustees in bankruptcy. In re Wil-Low Cafeterias, 2 Cir., 111 F.2d 83; In re James Butler Grocery Co., D.C., 12 F.Supp. 851; In re Cheney Bros., D.C., 12 F.Supp. 605.

The business of one who has become bankrupt is ordinarily operated by a trustee only to preserve value and to facilitate a favorable sale. No reorganization of the business is contemplated in these ordinary bankruptcy proceedings and there is seldom any surplus to be ultimately returned to the debtor. The objectives of the trustees in these ordinary bankruptcies are, therefore, those of liquidation and sale; and their chief responsibility is to unsecured creditors. Even so, they are held to a high degree of responsibility.

By virtue of Section 2 of the Bankruptcy Act, 11 U.S.C.A. § 11, a bankruptcy court is a court of equity, at least in the sense that, in the exercise of the jurisdiction conferred upon it by the Act, it applies the principles and rules of equity jurisprudence. Larson v. First State Bank, 8 Cir., 21 F.2d 936, 938.

As aptly stated by Mr. Justice Douglas, speaking for the Supreme Court of the United States in the recent case of Pepper v. Litton, 308 U.S. 295, 304, 60 S. Ct. 238, 244, 84 L.Ed. 281:

"The bankruptcy courts have exercised these equitable powers in passing on a wide range of problems arising out of the administration of bankrupt estates. They have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done. By reason of the express provisions of § 2 these equitable powers are to be exercised on the allowance of claims, a conclusion which is fortified by § 57, sub. k, 11 U.S.C.A. § 93, sub. k. For certainly if, as provided in the latter section, a claim which has been allowed may be later 'rejected in whole or in part, according to the equities of the case', disallowance or subordination in light of equitable considerations may originally be made. * * *

"That equitable power also exists in passing on claims presented by an officer, director, or stockholder in the bankruptcy proceedings of his corporation. The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it pari passu treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain cardinal principles of equity jurisprudence. A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 23 L.Ed. 328. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492, 39 S.Ct. 533, 537, 63 L.Ed. 1099. Their powers are powers in trust. See Jackson v. Ludeling [88 U.S. 616], 21 Wall. 616, 624, 22 L.Ed. 492. * * * While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders.

"As we have said, the bankruptcy court in passing on allowance of claims sits as a court of equity. Hence these rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy."

These principles have been enunciated in connection with ordinary bankruptcy proceedings, but they are likewise applicable to Section 77B proceedings. However, the objectives of trustees of a debtor in possession under Section 77B—

like the directors of debtor here—are not those of liquidation and sale. Their objectives are usually to rehabilitate the business and to operate it as a going concern, until the proposed reorganization can be completed. The trustees' responsibilities are, therefore, broad and strict. They must zealously guard any property rights of the entire community interest in the corporation—common shareholders, preferred shareholders, secured creditors and unsecured creditors—whomsoever may have an interest either during the reorganization or after it is completed. The directors, as trustees, are officers of the court appointed to act for the court, ordinarily under broad powers—necessarily so in order that they may function efficiently. Until the reorganization is completed, the trustees have no way of knowing exactly what security holders are their cestuis que trustent. Under such circumstances these trustees must keep themselves at all times free from entanglements. They must be able to act, without embarrassment, for whomsoever may ultimately be determined to be a beneficiary. They must not only not have an adverse interest but also they should scrupulously avoid placing themselves in such a position that an adverse interest may be possible. Wilson v. Continental Building & Loan Association, 9 Cir., 1916, 232 F. 824. They are arms of the court and should govern themselves accordingly.

Judge Learned Hand, speaking for the Circuit Court of Appeals for the Second Circuit in the case of In re National Public Service Corporation, 2 Cir., 68 F.2d 859, 862, states the matter succinctly as follows: "It is not enough that a creditor has means of information; he may insist that his interests shall be in the hands of a trustee who can act without embarrassing cross currents of motive; that he (the creditor) shall not be required to prove that the trustee has failed to press his interests; that the trustee's impartiality must be free from all question."

As expressed by then Chief Justice Cardozo of New York in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 62 A.L.R. 1, and quoted in the decision of the Circuit Court of Appeals for the Sixth Circuit in Re Van Sweringen Co., 119 F.2d 231, 234:

"Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

From these references it will be seen that the rules laid down by the courts are designed "to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of duty which is owing in a fiduciary capacity" (Magruder v. Drury, 235 U.S. 106, 119, 35 S.Ct. 77, 82, 59 L.Ed. 151) and these rules have long been strictly enforced (Michoud v. Girod, 45 U.S. 503, 4 How. 503, 557, 11 L.Ed. 1076), and they are required "because of the demonstrated fallibility of mankind". (Loring, A Trustee's Handbook, Shattuck Revision, p. 66.)

■ It has, of course, long been established that officers, directors and attorneys of a corporation are fiduciaries and that they should be held responsible for any breach of duties as such. They may not, while the corporation is insolvent, purchase claims against it at a discount and then enforce such claims at their full face value. Bonney v. Tilley, 1895, 109 Cal. 346, 42 P. 439; Davis v. Rock Creek Lumber, etc., Co., 1880, 55 Cal. 359, 36 Am.Rep. 40. When the corporation is not only insolvent but has filed its petition under Section 77B or Chapter X of the National Bankruptcy Act as amended, 11 U.S.C.A. § 501 et seq., and the directors have become trustees of the debtor in possession, the directors' obligations as trustees become even more rigorous. In re Norcor Mfg. Co., 7 Cir., 109 F.2d 407; Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281.

■ The good faith or innocent motives of the fiduciary, or his well-intentioned purpose to effectuate a plan of reorganization, constitute no defense to liabilities founded upon breaches of fiduciary obligations. In re McCrory Stores Corp., D.C.S.D.N.Y., 1935, 12 F.Supp. 267, 269, 30 Am.Bankr.Rep.,N.S., 670. In that case the court, discussing the question of the motive behind the purchase of claims, said:

"It is true that if some one with money had not appeared on the scene and reduced the scattered claims * * * to a single control, reorganization of the debtor would have been a most difficult task. It is also true that the present plan of reorganization is vastly more favorable to creditors and stockholders than the plan to which the debtor was then committed under its contract * * *. It may well be that the creditors and stockholders are better off because of the United's activities in the situation. These matters, however, have no legal significance."

 And it is likewise no defense to say that fraud was not intended and that unfairness did not result from the trustee's actions. Magruder v. Drury, 235 U.S. 106, 120, 35 S. Ct. 77, 59 L.Ed. 151; Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418; Tomblin v. Hill, 206 Cal. 689, 275 P. 941. Actual fraud in such cases is not necessary to give the client redress. A breach of duty is constructive fraud. Baker v. Humphrey, 101 U.S. 494, 25 L.Ed. 1065. There are many situations, in which a constructive trust is imposed even in the absence of fraud. 3 Scott on Trusts, § 462.

Mr. Justice Douglas, speaking for the Supreme Court of the United States, has recently said in a case dealing with compensation under Chapter IX of the Bankruptcy Act, 11 U.S.C.A. § 401 et seq. (American United Mutual Life Ins. Co. v. Avon Park, 311 U.S. 138, 61 S.Ct. 157, 162, 85 L.Ed. 91, 136 A.L.R. 860), but which statement of principles is equally applicable here:

"Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need. The requirement of full, unequivocal disclosure; the limitation of the vote to the amount paid for the securities (In re McEwen's Laundry, Inc., 6 Cir., 90 F. 2d 872); the separate classification of claimants (see First National Bank v. Poland Union, 2 Cir., 109 F.2d 54, 55); the complete subordination of some claims (Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669; Pepper v. Litton, supra), indicate the range and type of the power which a court of bankruptcy may exercise in these proceedings. That power is ample for the exigencies of varying situations. It is not dependent on express statutory provisions. It inheres in the jurisdiction of a court of bankruptcy."

 This court frankly feels that one in a fiduciary position—whether he be a director, an officer, or an attorney—who purchases the bonds of a corporation undergoing reorganization under Section 77B or Chapter X should be held to strict account, regardless of his good intentions and regardless of the legal or financial ability of the debtor corporation to buy those bonds. How otherwise can the purposes of the Congress in passing these amendments to the Bankruptcy Act be made effective? How otherwise may the court and those interested in the assets or business of the corporation have that confidence which is necessary for a successful outcome of reorganization proceedings?

Let us refresh our memory as to what has happened in connection with the attempt to reorganize the corporation now before us: In 1930, a plan of reorganization, without court proceedings, was proposed and many bondholders agreed in writing to the plan, deposited their bonds with a depositary and, among other things, agreed to a reduction in their interest rate from $7\frac{1}{2}\%$ to 6% per annum. The reduction was a definite one and is still in effect. Nonassenters and nondepositors did not agree to this reduction. The proposed plan of reorganization of 1930 failed. Then, the original plan of reorganization under Section 77B was filed in this court January 28, 1938. The petition for that purpose contained a plan of reorganization which was substantially that previously proposed in 1930. After extensive hearings on the plan, it was subjected to certain amendments at the suggestion of or with the approval of this court and was finally confirmed. This approval was then confirmed by the Circuit Court of Appeals for the Ninth Circuit on appeal (In re Los Angeles Lumber Products Co., 100 F.2d 963), but the plan was rejected by the Supreme Court of the United States as hereinbefore indicated, particularly upon the ground that the plan, as a matter of law, was not fair and equitable. This plan, so rejected, provided for a small participation in the reorganization by preferred shareholders of debtor. Assets of the old corporation were to be transferred to a new corporation, the stock of which was to be held in part by old preferred shareholders, and the balance by bondholders of the old corporation. During all of this time the directors of the

debtor in possession believed that they were acting as trustees for cestuis que trustent who were a group composed of both old stockholders and bondholders. After the rejection of this plan by the Supreme Court, the plan was amended so that all of the stock of the new corporation, to which these assets were to be transferred, was to be owned by bondholders. There were, in effect, no unsecured creditors because these were to be paid off in cash. The bondholders were then to own the corporation and it was they whom the directors in possession, as trustees, were to represent. When the plan was presented to the court, as amended, it recognized no distinction among bondholders. The court required the plan to be further amended so that bondholders who had *not* consented to the reduced interest rate under the 1930 plan would receive a larger interest allowance on their bonds than those who had so consented to the reduction and therefore would get pro rata more stock interest in the new corporation.

Is it proper for a trustee to place himself in a position in which it may be said that it is not humanly possible for him to see to it that both types of bondholders are fully protected in the plan? Should a trustee engage in any contest for voting control of the very corporation for which he is acting as such trustee, or attempt to influence the selection of the corporation's officers and directors by acquiring voting control alone or in association with a particular group? We think not. The court is looking to him as one of its court officers, and the ultimate stockholders—even though their identity and exact interest may not be disclosed until the final plan of reorganization is confirmed—are looking to him, as a trustee, to deal impartially, without the slightest taint of self-interest. They properly expect him to see to it that the assets and business of the corporation are honestly and efficiently held and operated and that they are justly and legally distributed, uninfluenced by personal interest.

Mr. Faries, in his latest brief filed August 21, last, urges that each of three cases "amply support our contention that an attorney, officer and director of an insolvent corporation, may, within certain limits, i. e., certainly within the facts of this case, purchase bonds and enforce them without preference, in the same manner as other bondholders." The three cases referred to are: Donnelly v. Consolidated Investment Trust, 1 Cir., 1938, 99 F.2d 185; In re New York Railways Corporation, 2 Cir., 1936, 82 F.2d 739, certiorari denied Brukenfeld v. New York Rys. Corp., 298 U.S. 687, 56 S.Ct. 959, 80 L.Ed. 1406; Seymour v. Spring Forest Cemetery, 144 N.Y. 333, 39 N.E. 365, 26 L.R.A. 859. Let us analyze these cases as briefly as possible:

The Donnelly case involves the purchase of shares (certificates of beneficial interest) in a Massachusetts business trust, a holding company owning all the shares (certificates of beneficial interest) in a like trust, a manufacturing company which petitioned for reorganization under Section 77B. The holding company was not in bankruptcy. Nor does it appear that either the holding company or the manufacturing company were insolvent. The opinion shows that just prior to the purchase of the shares of the holding company there had been an offer to buy the assets of that company "at a price which would realize for the common shares $90.00 each." The opinion further shows that the owner of each share of the holding company was offered $42 in cash, a bond of the manufacturing company worth $40 and a share of the manufacturing company's stock. The assets of the holding company, therefore, greatly exceeded its liabilities, exclusive of capital stock liability; thus it was in a solvent condition. The court pointed out in connection with the manufacturing company that after reorganization and "after all direct claims had been paid a surplus remained distributable to its shareholders." [99 F.2d 187.] Thus, the manufacturing company was likewise solvent. The purchases in question in this case were not purchases of claims as in the case at bar, but were purchases of shares or certificates of beneficial interest in a Massachusetts trust. All purchases were made before any petition was filed under Section 77B, and with nothing in the record to indicate that such a petition was contemplated when they were made; nor does it appear that the manufacturing company was a debtor in possession.

The next case cited, the New York Railways Corporation case, was a case in which the court expressly found that the purchaser of the securities there involved was not a fiduciary. The purchaser was not a director, a vice-president or counsel for the debtor.

The other case cited, the Seymour case, merely holds that it is not a breach of duty for a director to purchase the bonds of his corporation while it is a going concern and solvent. So far as appears from the record

this corporation was, both at the time of the acquisition of the bonds and at the date of their enforcement, a solvent concern. No question of bankruptcy or insolvency is involved.

These three cases are, therefore, easily distinguishable from the case at bar. It should be noted also that they were decided prior to the recent decisions of the Supreme Court of the United States in Taylor v. Standard Gas & Electric Co., 1939, supra; Pepper v. Litton, 1939, supra; American United Mutual Life Ins. Co. v. Avon Park, 1940, supra; Woods v. City National Bank & Trust Co., 1941, 312 U.S. 262, 61 S.Ct. 493, 85 L.Ed. 820. All of these Supreme Court cases hold fiduciaries to strict standards of conduct, including officers, directors, controlling stockholders of corporations, bondholders' committees, etc., and make it clear that the equitable powers of a bankruptcy court are sufficient to provide an appropriate remedy for violation of these standards.

▇▇▇ As to Mr. Faries' contention that debtor's refusal to accept his offer to sell his bonds constituted a ratification of the purchases and a waiver of debtor's right to assert that he held the bonds as a constructive trustee for their benefit:

The action of debtor's board of directors was merely a rejection of a business proposition. Mr. Faries offered to sell their corporation certain bonds at a certain price. They declined the offer. That offer was made by Mr. Faries with assurances that he had done no legal or moral wrong, that he was under no *legal* obligation to sell the bonds to the corporation and was making the offer voluntarily. The situation had just recently been brought officially to the attention of the Board of Directors and the Court and the facts connected therewith had not yet been disclosed. This action of the Directors in rejecting the offer surely does not prevent them later, when the full facts are revealed, from asserting any legal right which may then be indicated. Nor was the board's action effective until approved by the court. This court gave only a conditional approval. It had only a limited knowledge of the facts and refused to prejudge the matter. The court, when it approved the directors' business judgment in not making a commitment of purchase, did not pass upon the debtor's legal right to make such purchase. It stated, expressly, that even its limited approval was without prejudice and was not to preclude any right or remedy which the corporation or its creditors might have. Mr. Faries made no objection to the reservation. Manifestly there can be no waiver here of any right other than the right to compel Mr. Faries to keep the business proposition open. Of course, that offer to sell as a business proposition had to be accepted or rejected, promptly and finally. Nor can there be said to be a ratification of these purchases when debtor's directors were not yet in possession of the facts.

▇▇▇ As to Mr. Faries' contention that it mattered nothing to debtor who owned its bonds, whether he owned them or someone else owned them, the total obligations of debtor remained the same: we are impressed by a statement from the decision of the court in Bramblet v. Commonwealth Land and Lumber Company, 1904, 83 S.W. 599, 602, 26 Ky.Law.Rep. 1176, 1179; Id., 84 S.W. 545, 27 Ky.Law.Rep. 156, where the president of a corporation had induced a third person to purchase at a discount certain judgments against the corporation, which judgments were then used in purchasing the property of the corporation at a foreclosure sale. Under the arrangement the president and the third party were to divide any resulting profits. The court there held that neither the president nor the third person were entitled to derive any profit from the transaction. In this case the facts are, of course, easily distinguishable from the case at bar. However, the language of the court is well chosen and pertinent in the instant case:

"We have no hesitancy in declaring the law to be that a president of an insolvent and failing corporation cannot traffic in its property to his advantage and to its disadvantage, or buy in debts against it at heavy discount and then assert them for full value. To the argument that it does not matter to the corporation who owns its debts, so it honestly owes them, and that it is immaterial to it whether its president gets them for nothing, as it does not have to pay any more than it actually owes in any event, the answer is, it does matter, for human nature is not so constituted that the same person can fairly represent opposing sides of the same question—cannot be both creditor and debtor. * * * The policy of the law is to insure fidelity of trustees to their trusts by making it impossible for them to profitably neglect or abuse them."

And so it is said by the Supreme Court of Illinois in Ravlin v. Chicago, A. & De K. R.

Co., 297 Ill. 130, 129 N.E. 730, 736: "When a person accepts an appointment as receiver he must not permit his personal interests to in anywise conflict with his duty in that respect. It is well settled that a receiver can make no profit out of his trust other than the compensation which the court may allow him under the law. He cannot deal with the property involved for himself while he is receiver, and if he does, the benefit must inure to the trust estate. It makes no difference if the company for which he is receiver was not a loser in the transaction, nor however free from fraud the transaction may be."

Naturally, most of the cases which come before the courts are those in which the fiduciary has both breached his trust and made a profit. The important thing is not the profit but the principle of equity behind the liability.

■ To the argument that Mr. Faries did not breach his trust because the debtor corporation was not in the market to purchase bonds, we feel that no such narrow interpretation may be given to the obligations of a director of a debtor in possession under Section 77B. In Irving Trust Co. v. Deutsch, 2 Cir., 1934, 73 F.2d 121, 124, certiorari denied Bell v. Irving Trust Co., 294 U.S. 709, 55 S.Ct. 406, 79 L.Ed. 1243, the court said:

"The defendants' argument * * * that the equitable rule that fiduciaries should not be permitted to assume a position in which their individual interests might be in conflict with those of the corporation can have no application where the corporation is unable to undertake the venture, is not convincing. If directors are permitted to justify their conduct on such a theory, there will be a temptation to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity of profit will be open to them personally."

Mr. Faries seems to think that the only remedy which debtor may have—if indeed it has any remedy—is to impose a constructive trust, declare that he acted for the corporation in purchasing the bonds, and take over his bargain, i. e., pay Mr. Faries his cost, and possibly interest on that cost and such expenses incident thereto as the court may determine. We do not believe that our powers as a bankruptcy court are so limited. To so hold would be to defeat the very purposes of the rule of law

giving redress. The fact of insolvency and the pendency of reorganization proceedings would ordinarily make such cash expenditure inadvisable and, under most circumstances, impossible. In the instant case it would have required the tying up of a large sum of money which was vitally necessary for working capital. To have so used that money would have practically stopped any thought of expansion, would have made impossible large and profitable government shipbuilding contracts, and might, temporarily at least, have restricted debtor's activities to small contracts for repair of ships.

■ Whatever may be the rule of law in cases involving solvent corporations, the court of bankruptcy cannot permit itself to be so limited in the case of insolvent corporations. As said by the Supreme Court of the United States in Pepper v. Litton, supra: the bankruptcy court has the power, in the exercise of its equitable jurisdiction, to sift the circumstances surrounding any claim and to see to it that injustice or unfairness is not done in the administration of bankrupt assets. And the Congress in Section 77B, sub. b and in Section 212 of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 612, has made specific provision for the limitation of claims acquired by certain fiduciaries to the consideration paid therefor. Whether or not the specific language used in these sections is sufficiently broad to include the acts of Mr. Faries in the instant case, is beside the point. The very remedy provided in those sections has long been recognized and applied in the exercise of the general equitable power of the bankruptcy court. See Bonney v. Tilley, supra; In re Norcor Mfg. Co., supra. Cf. In re McEwen's Laundry, Inc., 6 Cir., 1937, 90 F.2d 872.

■ In the light of these broad equitable principles, the court may then adopt that remedy which it deems most appropriate under the circumstances. The court deems this to be the most appropriate remedy, namely, the limitation of the claim of Mr. Faries to his cost, plus interest on each item at the rate of six per cent. per annum from the date of acquisition to date of the decree of this court to be hereafter entered after there has been a compliance with Rule 8 of this court. In all fairness, I am disposed to allow Mr. Faries interest on his cost to this date because, due to the desire of all counsel to make a full presentation of the matter, final settlement has been de-

layed and Mr. Faries has been enjoined, in the meantime, from disposing of his bonds.

In applying this remedy, we must not be considered to hold that debtor corporation could not have declared a constructive trust in connection with Mr. Faries' dealings. We merely hold that the remedy by way of limitation of claim seems to us more just and more appropriate.

It seems to the court that Mr. Faries was, upon principle, under the same disability as to the bonds purchased before as he was with regard to those purchased after the institution of these proceedings. Reorganization was really in process at the time Mr. Faries made his first purchases in July, 1937, and the evidence shows that debtor was then insolvent. The Board of Directors had authorized it on December 23, 1936. All that was required was the choice of the method and the filing of the formal papers. See In re Van Sweringen Co., supra; Bonney v. Tilley, supra; Davis v. Rock Creek Lumber, etc., Co., supra.

We must now consider the petition of District Bond Company and of Deposited Bonds & Shares Corporation, a subsidiary, whom we shall hereafter describe as "District Bond", under the joint account arrangement which they entered into with Mr. Faries for the purchase of bonds. Permission was never sought from the court or the board of directors of debtor, either by Mr. Faries or any representative of District Bond, to purchase these shares so held in joint account, either from Mr. Spicer or from any other bondholder. Nor was any petition filed asking for ratification of such action. Mr. Spicer and his counsel came into court during a hearing on the confirmation of the plan and asked that Mr. Spicer's resignation as president be confirmed. At this time also, the court was requested to confirm the election, respectively, of Mr. Powell as president and Mr. Harrold English as a director in place of Mr. Spicer. The statement was made in open court that Mr. Faries had bought Mr. Spicer's bonds. No details were given as to the number of bonds owned and sold by Mr. Spicer nor as to the price paid. The information regarding the sale was merely supplied incidentally as a reason for the resignation of Mr. Spicer and the election of Messrs. Powell and English, confirmation of which was sought.

The other facts have been rather fully set forth herein, particularly in the quotations from the findings of Judge Fee. These findings made it clear to the court that District Bond knew that Mr. Faries was a fiduciary. Having this knowledge, it joined in an enterprise in which Mr. Faries' personal interest might conflict with the interests of those for whom he was a fiduciary and which, therefore, might involve a breach of trust. The law seems clear that under these circumstances District Bond may not be treated in any way differently than Mr. Faries is treated. The Supreme Court of the United States, in the leading case of Jackson v. Smith, 254 U.S. 586, 41 S.Ct. 200, 65 L.Ed. 418, decided this question. In that case the receiver for a building association agreed with the defendants, one of whom was his attorney and one of whom was an outsider, that the outsider should purchase the property of the association at a foreclosure sale for the joint account of all three. The property was so purchased and was later sold at a profit. In a suit instituted by the receiver's successor, defendants were required to account for their profits in the transaction, even though the defendant had been the highest bidder at a public sale which was found to have been fairly conducted. The court, in enforcing this rigorous rule, made the following statement:

"When he [the receiver] agreed with Smith and Wilson to join in the purchase if Wilson should become the successful bidder, he placed himself in a position in which his personal interests were, or might be, antagonistic to those of his trust. Michoud v. Girod [45 U.S. 503], 4 How. 503, 552, 11 L.Ed. 1076. It became to his personal interest that the purchase should be made by Wilson for the lowest possible price. The course taken was one which a fiduciary could not legally pursue. Magruder v. Drury, 235 U.S. 106, 119, 120, 35 S.Ct. 77, 59 L.Ed. 151. Since he did pursue it and profits resulted the law made him accountable to the trust estate for all the profits obtained by him and those who were associated with him in the matter, although the estate may not have been injured thereby. Magruder v. Drury, 235 U.S. 106, 35 S.Ct. 77, 59 L.Ed. 151. And others who knowingly join a fiduciary in such an enterprise likewise become jointly and severally liable with him for such profits. Emery v. Parrott, 107 Mass. 95, 103; Zinc Carbonate Co. v. First National Bank, 103 Wis. 125, 134, 79 N.W. 229, 74 Am.St.Rep. 845; Lomita Land & Water Co. v. Robinson, 154

Cal. 36, 97 P. 10, 18 L.R.A.(N.S.) 1106. Wilson and Smith are therefore jointly and severally liable for all profits resulting from the purchase; the former although he had no other relation to the estate; the latter, without regard to the fact that he was also counsel for the receiver." (Pages 588, 589 of 254 U.S., page 201 of 41 S.Ct., 65 L.Ed. 418).

In Irving Trust Co. v. Deutsch, 2 Cir., 1934, 73 F.2d 121, certiorari denied Bell v. Irving Trust Co., 294 U.S. 709, 55 S.Ct. 406, 79 L.Ed. 1243, there was a suit brought by the trustee in bankruptcy of a corporation against certain of its directors and an outsider for an accounting of profits from a transaction in the stock of the corporation which involved a violation of the fiduciary duties of the directors. The court held that the outsider was also liable to account, although he owed no fiduciary duty to the bankrupt, saying: "* * * we think there is an applicable principle which requires him to account, namely, that one who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise." (Page 125 of 73 F.2d)

In Ripperger v. Allyn, D.C.S.D.N.Y., 1938, 25 F.Supp. 554, the court said: "One who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise. Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121." (Page 555 of 25 F.Supp.)

See, also: In re Standard Commercial Tobacco Co., D.C.S.D.N.Y., 1940, 34 F. Supp. 304; Smith v. Blodget, 187 Cal. 235, 201 P. 584; Lomita Land & Water Co. v. Robinson, 154 Cal. 36, 97 P. 10, 18 L.R.A., N.S., 1106; Chappel v. First Trust Co. of Appleton, Wisconsin, D.C.E.D.Wis., 1940, 30 F.Supp. 765.

In the last cited cases, the third party, or outsider, participating in the breach of trust, was held liable to account for any profits acquired and to restore the property acquired upon a constructive trust theory. In many cases the participant in a breach of fiduciary obligation has been made to respond in damages. 3 Scott on Trusts, § 321 et seq. As we have said, we might have applied the same remedy here but felt that the limitation of claim was the more appropriate remedy.

While the enforcement of the rule may seem harsh in the instant case, we feel that, under the controlling decisions, it must be applied here. In re McCrory Stores Corp., supra; In re Van Sweringen Co., supra. Any claim which District Bond may have as a joint owner of bonds will then be treated by debtor corporation in exactly the same manner in which the Faries claim has been ordered to be treated.

The court has reconsidered its decision of February 8, 1941 (In re Los Angeles Lumber Products Co., 37 F.Supp. 708) in connection with the compensation of Messrs. Faries and McDowell as counsel for the debtor and believes that its conclusions therein were sound. The motion for new trial in that regard is denied and the order of this court filed March 31, 1941, vacating the decision of this court of February 8, 1941, is itself vacated, and the decision of February 8, 1941, will be reinstated.

The petition of Mr. Faries under date of October 26, 1940, asking for the approval of sale to Annie K. Borbridge of one certificate of deposit representing a one-thousand-dollar bond of debtor and two shares of Class "B" stock thereof, will be granted.

Counsel for debtor will prepare and submit within ten days, as required by Rule 8 of this court, findings of fact, conclusions of law and form of decree in accordance with the foregoing. Any counsel desiring to file objections thereto may do so within five days thereafter.

It is so ordered.